**Gabrielle Joan DENNIS, Individually and in the alternative, Anna Mae Dennis Malet, Widow of M. Malet, Petitioner and/or Curator of the Interdict, Gabrielle Joan Dennis, Plaintiffs,**

v.

**CENTRAL GULF STEAMSHIP CORPORATION, and/or the ABC Corporation, XYZ Corporation, and the PDQ Insurance Corporation, Defendants.**

Civ. A. No. 66–125.

United States District Court,
E. D. Louisiana,
New Orleans Division.

Feb. 4, 1971.

944

Charles G. Jacques, Jr., Harold J. Lamy, New Orleans, La., for plaintiffs.

John R. Peters, Jr., New Orleans, La., for defendants.

RUBIN, District Judge:

Joseph A. Dennis, a Marine Surveyor representing the United States, went aboard the SS GREEN BAY while it was moored at the Charbonnet Street Wharf in New Orleans to determine the ship's condition, and inspect its holds, ladders and equipment to see if they were in proper order. His inspection was for the purpose of determining the cash consideration to be paid in a proposed trade of the vessel between the owner of the GREEN BAY and the United States for another ship.

Mr. Dennis was accompanied by Charles Wolff, the shipowner's Superintendent of Engineering. After inspecting two holds of the vessel on the morning of August 7, 1965, they went to lunch. Then they returned to the vessel and descended into the No. 3 hold to inspect it. One pontoon had been removed from the upper deck and scattered hatch boards had been removed from the upper and lower tween decks of this hold, so there was some natural light. Mr. Wolff and Mr. Dennis entered the hold from the midship house through a tunnel into the first tween deck section. They were proceeding to the bottom of the hold with the purpose of checking the hold from its bottom up. There were two bulkhead ladders in this hatch, one forward one aft. Wolff used the after ladder, Dennis used the forward one. Wolff was familiar with the vessel and with this hatch, but Dennis had never been on the vessel before this day and had never visited this hatch. No reason was advanced by either party why Dennis chose a different ladder rather than follow Wolff.

When Wolff got down to the tank tops, the bottom of the hold, he looked for Dennis and saw his legs descending the other ladder. The after ladder, which Wolff had used, had rungs all the way to the tank tops, but the forward ladder stopped about four feet above the tank tops just below the point where a horizontal guard rail had been installed to protect pipes in the lower hold from damage by cargo. To descend from the end of the ladder to the tank tops, it was necessary to climb on the guard rails which were about one and one-half feet out from the bulkhead. The ladder was recessed so, in order to step to the guard rails, a person descending the ladder had to step backward about twelve inches as well as down. The guard rails were of

angle iron and were not installed horizontally but were slanted at a slight pitch.

The forward ladder in the No. 3 hold was the only ladder on the vessel constructed in this manner and there is no evidence that Dennis knew of its unique characteristics. Certainly Wolff said nothing to him about this in advance, because, Wolff said, he had expected Dennis to follow down the aft ladder.

When Wolff saw the descending legs, he took a flashlight he was carrying in his pocket, and focussed its beam on the forward ladder. Wolff testified that, when Dennis' feet reached the pipe guard, Wolff said, "Joe, you're on the pipe guard." He received no reply nor was there any indication Dennis heard the remark. But Dennis stepped back and fell to the tank top. Wolff thought he hit the back of his head but the medical report indicates clearly that Dennis' primary injury was a right frontal skull fracture. Wolff went over right away, but Dennis was unconscious. Wolff ran for help, and Dennis was removed from the hold and taken to the U. S. Public Health Service Hospital. He regained consciousness, but remained critically ill, sometimes conscious, sometimes not, for eight and one-half months, when he died.[1]

■ Plaintiff, decedent's thirty-one year old daughter and sole survivor, sued on the basis that the vessel was unseaworthy, and on grounds of negligence. At the close of the plaintiff's case, the court entered a judgment of dismissal of the unseaworthiness count on the basis that the plaintiff was not a member of the crew of the vessel (compare Filipek v. Moore-McCormack Lines, 2d Cir. 1958, 258 F.2d 734, rigging tester) nor was he doing seaman's work. Partridge v. Pope and Talbot, Inc., N.D. Cal.1965, 257 F.Supp. 456; Royston v. Pacific Far East, N.D.Cal.1960, 190 F. Supp. 450. However, it is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those aboard the vessel who are not members of the crew. Kermarec v. Compagnie Generale Transatlantique, 1958, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550.

## I. NEGLIGENCE

■ The location and manner of construction of the pipe guard at the bottom of the No. 3 forward bulkhead ladder, extending some four feet above the deck of the lower hold with a slanted surface of approximately thirty degrees, presented an unusual and hazardous condition. The defendant knew of this condition of course, and it could reasonably foresee that this might cause or contribute to an accident if a person who was unaware of this construction descended the ladder and had to climb down the pipe guard. Indeed, a qualified naval architect testified that the ladder presented an unusual and unsafe condition, and that he had never gone down a ladder with this type of construction during his entire experience as a mate, naval architect or marine surveyor. The slanted surface of the pipe guard was peculiarly hazardous to someone coming down the ladder. Any moisture or foreign matter on the shoes of the person

---

1. Defendant contends that Dennis was never conscious. But the hospital record notes, for example: 7 Aug. 1965 "Presently pt. is conscious, complains of some headache." Clinical Record: "At the time that the patient was brought to the emergency room he was ambulatory without assistance and complained only of headache." Then "On 8/10/65 the patient appeared less responsive and became somewhat comatose, responding only to painful stimuli by moving his extremities. * * * Postoperatively the patient had a prolonged and somewhat difficult course remaining semi-comatose for approximately one week. Following this he showed some progressive increase in his state of consciousness and with the aid of physical therapy had been taught to walk. * * * He had some post prandial vomiting brought on mainly when he became grossly upset. He was completely incapable of managing his own affairs and required close care in the hospital to take care of his activities of daily living.

using the ladder or on the pipe guards themselves would make them extremely slippery.

When a person descends a ladder he comes down at a certain gait. The presence of this pipe guard would break the normal pattern of descent. The lack of a flat or level top surface to allow him to adjust to a change, and the further absence of any type of handrail to steady his course the remainder of the way, presented an unsafe condition. There were no warnings on the ladder or in the tween deck section to advise persons using the ladder that there was a pipe guard construction at the bottom of the ladder.

Nor is it any defense that this particular guard rail in all C–4 vessels was constructed in the same manner, if indeed it was—a matter that the evidence leaves in some doubt. Negligence does not become excusable because it is oft repeated. See Prosser, Law of Torts, 170.

Neither is it sufficient that the vessel had been inspected by the American Bureau of Shipping and given the highest rating possible. There is no evidence that this particular guard rail construction was called to its attention and pro-announced safe.

Of course Mr. Dennis could have requested that more than one pontoon be removed from the top deck and conceivably more light would have been provided below. But there was no reason for him to foresee the need for this. Had the ladder been of the same construction as the ladders Dennis had already used in this vessel, it would likely have been unnecessary.

The medical records and the X-ray report clearly show that Dennis had a right frontal skull fracture. The hospital record does not indicate that he had any type of injury to the back of his head. Therefore it is likely that Dennis did not strike the back of his head, as Wolff thought, but rather hit the forward part of his head when he fell. This could have occurred if he slipped off the pipe guard on the slanted surface and struck his head either on the ladder or the pipe guard as he fell to the deck below. Therefore it is likely that he fell without warning, struck his head and knocked himself unconscious.

## II. CONTRIBUTORY NEGLIGENCE

Dennis did not descend the ladder with the utmost of caution. But he was expecting a normal ladder, not one with a hazard. There was no way he could anticipate this ladder's unusual method of construction. He had no warning, nor any way to learn that he should be more careful than he had been in climbing down other ladders aboard the ship.

He had been a surveyor for thirteen years, and he had been an engineer for some twenty-five years. He was sober, in good health, and Wolff's testimony shows that he was descending the ladder in the usual and normal fashion. There is no basis for finding him contributorily negligent under the circumstances of this case.

## III. DAMAGES

### A. General Considerations

When this suit was filed, it seemed clear that, if the plaintiff recovered, the measure of damages would be fixed by Article 2315 of the Louisiana Civil Code. Now that proposition requires further study.

In The Harrisburg, 119 U.S. 199, 7 S. Ct. 140, 30 L.Ed. 358, the Supreme Court held that there was no right to recover for wrongful death under the general maritime law. The court there recognized that dependents of those who died in territorial waters could utilize state wrongful death statutes in federal court to recover.

In The Tungus v. Skovgaard, 1959, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524, the Court considered the content of that right. Confirming the right to recover in admiralty under state statutes,

it held that the federal courts were enforcing a *right* granted by a state "subject to the limitations which have been made a part of its existence." [358 U.S. at 592], 79 S.Ct. at 506. A federal court's duty in a wrongful death case was to interpret the law of the state. Both the right of recovery and the limitations on that right were held to be those recognized by state law. Justice Brennan dissenting, with the concurrence of Chief Justice Warren and Justices Black and Douglas, stated that, in his opinion, the right to recover was a federal one, and state limitations on it should not obtain. He drew a sharp distinction between the right created by federal law, and the utilization of a state remedy for recovery.

In Moragne v. States Marine Lines, 1970, 398 U.S. 375, 90 S.Ct. 1772, 26 L. Ed.2d 339, the Supreme Court overruled *The Harrisburg* and decided that there was a right to recover for wrongful death under federal maritime law. It specifically declined to fix the proper measure of damages to be awarded under the new federal right.

To determine the measure of damages in this case, this court must first decide whether the right created in *Moragne* supplanted the right discussed in *The Tungus* or complemented it. If the decision in *Moragne* supersedes the rule of *The Tungus,* state wrongful death statutes no longer provide the measure of damages for death in coastal waters, and the rule fixing the items of damage now recoverable must be derived from other authorities. If *The Tungus* is still afloat, the Louisiana Death Statute may still provide the measure of damages for the plaintiff's claims in this case.

The opinion in *Moragne* does not expressly determine this issue. But it refers to *The Tungus* as the corollary of *The Harrisburg* and it at least twice explicitly refers to *The Tungus* rule as permitting federal courts to adopt a *remedy* created by state law, rather than enforcing a state *right*.

One of the major reasons advanced for rejection of *The Harrisburg* was that the federal rule should be uniform nationwide. The majority opinion in *The Tungus* took the view that recovery was granted because the admiralty was adopting the State's right of action, and hence "must enforce the right as an integrated whole, with whatever conditions and limitations the creating State has attached." However, the dissent took the view, "The Court has simply failed to grasp the important distinction here between duties and remedies * * *. It is the federal maritime law that looks to the state law of remedies here * * *." Hence the reference by the Court in *Moragne* to state remedies, rather than to state rights, indicates a departure from *The Tungus* rationale.

■ These considerations all lead to the conclusion that the newly recognized federal right has abandoned *The Tungus* rule as derelict. That is the conclusion reached only a few days ago in U. S. Steel v. Lamp, 6 Cir. 1970, 436 F.2d 1256.[2]

Indeed, the concept that state law created a right to recover for death on state coastal waters had caused considerable difficulty. It was necessary to consider the substance of the state created right, *The Tungus,* supra, and its relationship to maritime law under the state laws of the various coastal states. See

2. Neither Guilbeau v. Calzada, La.App. 1970, 240 So.2d 104, nor Hornsby v. Fish Meal Co., 5 Cir. 1970, 431 F.2d 865, considered the damage issue presented here. Both cases found that, after *Moragne,* the traditional admiralty doctrine of comparative negligence was applicable in suits for death in coastal waters. That doctrine replaced the Louisiana state doctrine that contributory negligence is a bar to relief, which, under the *Tungus,* had governed recovery for death in Louisiana waters. *Guilbeau* further held that the schedule of beneficiaries provided for in the Death on the High Seas Act would be adopted for suits for death in coastal waters. No discussion helpful to the resolution of the problem in this case accompanied that holding.

Hess v. United States, 1960, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 and Goett v. Union Carbide Corp., 1960, 361 U.S. 340, 80 S.Ct. 357, 4 L.Ed.2d 341. To take the view that *Moragne* added a federal right while leaving the state remedy intact would provide some suitors with a choice of remedies, but the confusion created by the existence of federal and state remedies with differing rights, differing defenses, and differing limitation periods, and potentially different beneficiaries would not be abated. No state remedy now seems necessary for a violation of the federally imposed duties of the maritime law. See 90 S.Ct. at 1788 n. 15. The replacement of the state remedy by the federal one is forecast in *Moragne*:

> Our recognition of a right to recover for wrongful death under general maritime law will assure uniform vindication of federal policies, removing the tensions and discrepancies that have resulted from the necessity to accommodate state remedial statutes to exclusively maritime substantive concepts. [398 U.S. at 401], 90 S.Ct. at 1788.

In *Moragne* the Court concluded that the items of damage recoverable for maritime death would be best determined in case by case adjudication. Here the plaintiff pleaded and proved three items of damage. Although other items of damage were not specifically pleaded, they were proved without objection. The recoverability of each under the maritime right will be considered separately. Thus, if an appellate court should decide that some items for which I have awarded damages were not correctly allowed, remand will be unnecessary.

Three separate groups of cases have considered similar problems and may be drawn on here: claims for the death of "blue water" seamen against their employers under the Jones Act; claims for the death of ship and plane passengers, "true" seamen against others than their employers, and for the death of Sieracki seamen under the Death on the High Seas Act; and the host of cases under the various state wrongful death laws.

It appears premature to attempt to formulate one pervasive doctrine. But it is obvious that, unless a single national rule of damages is evolved, potential inequities, coupled with problems of fine distinctions will persist. If, for example, a vessel sank in Louisiana coastal waters, as a result of its unseaworthiness (coupled perhaps with the negligence of its master), resulting in the death of both a member of its ocean going crew, a passenger, and a longshoreman, claims by their representatives and survivors for the same items of damage should not be governed by different principles (though perhaps the right to recover might be governed by different principles).

### B. Loss of Support

■ Loss of support is recognized as a recoverable item of damages by all three bodies of law. National Airlines v. Stiles, 5 Cir. 1959, 268 F.2d 400 (Death on the High Seas Act); Norris, The Law of Seamen, 3d Ed. Sec. 697 (Jones Act); Harper and James, The Law of Torts, Sec. 24.2 (all state wrongful death statutes). Recovery for this item will be permitted.

The decedent was a widower. He was survived by his only daughter, Gabrielle Joan Dennis, who was 31 years of age at the time of the death of her father. Miss Dennis suffers from a schizophrenic reaction with border line intelligence and is somewhat retarded. She has not been able to work for some years or to support herself, and she was totally and completely maintained by her father at the time of his death, as she had been throughout most of her life. She lived with her father who paid for everything she needed in life. She had no income. However, she inherited the duplex house in which she and her father lived. One side of this is her home and the other side yields her a modest rental income.

No evidence was offered to show a loss of inheritance by reason of a shortening of the decedent's life.

Dennis was 61 years old when he died. His life expectancy, according to the 1967 tables of the United States Department of Health, Education and Welfare, was then 15.4 years. Civil Service regulations would have permitted him to work until 70, but even so, his work life expectancy was something less than 9 years.

He had been earning $11,000 a year from his work as a marine surveyor. He had a Marine Engineers Beneficial Association pension of $4,000 per year, which terminated upon his death. Had Mr. Dennis lived, the pension would have continued for the rest of his life.

Mr. Dennis' income tax amounted to $2,843, leaving him a net economic income after taxes in the year of his death of $12,336. It is likely he would have had an income of this amount for not less than eight years, and thereafter an income of $4,000 for seven more years. It is also likely that he would have contributed equally generously to his daughter's support so long as he lived without reduction because of his own retirement. The evidence shows that Miss Dennis lives quietly, dresses modestly, has no social engagements, and little medical expense. In my opinion, she has established an average loss of support of $1,800 a year for 15.4 years. Discounted at 5½% (an amount at which U. S. obligations can now be purchased) this amounts to $18,864.

### C. The Decedent's Damages

■ The plaintiff has established certain items of damage suffered by the decedent and not by her: his conscious pain and suffering and the wages he lost between the time of the accident and his death. Not all states permit the survivors to recover these items, but a good many do and the number is constantly increasing. Harper and James at Sec. 24.2. The Jones Act permits such recovery. Hutchison v. Pacific-Atlantic Steamship Co., 9 Cir. 1954, 217 F.2d 384 and cases cited therein. The Death on the High Seas Act does not. Norris at Sec. 652 and cases cited therein.

It seems anomalous for the decedent's family to lose what the decedent could himself have collected had he filed a suit and prosecuted it to judgment during his life. There is no federal maritime policy against such recovery and some courts have permitted such recovery under the Death on the High Seas Act when the tortfeasor's state of domicile allowed it. See e. g. Canillas v. Joseph H. Carter, Inc., S.D.N.Y.1968, 280 F. Supp. 48. Recovery for these items will be permitted.

The decedent lingered from August 7, 1965 until April 21, 1966, a period of 8½ months. His sister testified that he often complained of pain and discomfort. He excreted large amounts of mucous and his sister had to attend him constantly to clear his throat and thus prevent him from choking. The amount suggested by the plaintiff for this pain and suffering, $20,000, is reasonable and will be allowed.

■ During the 8½ months between the accident and his death, Dennis lost approximately $10,752.50 in gross income. The plaintiff will be permitted to recover this amount. See Anno. Damages Considering Income Taxes, 63 A.L.R.2d 1393 (1957).

### D. Funeral Expenses

■ The majority of states permit recovery for funeral expenses. Anno., Funeral expenses as an element of damages for wrongful death, 94 A.L.R. 438, 441. But it is not allowed under the Jones Act, Cities Service Oil Co. v. Launey, 5 Cir. 1968, 403 F.2d 537, or under the Death on the High Seas Act. The Culberson, 3 Cir. 1932, 61 F.2d 194; First National Bank in Greenwich v. National Airlines, S.D.N.Y.1958, 171 F. Supp. 528. In denying recovery, the courts have found that these federal statutes have created new rights, and, by a rule of strict construction, have limited the scope of the recovery each allows. The rationale of the cases is that both

statutes literally extend only to recovery of pecuniary losses of the survivors, and funeral costs are an expense of the estate rather than of the sorrowing relatives. Cities Service Oil Co. v. Launey, 5 Cir. 1968, 403 F.2d 537, 540; The Culberson, 3 Cir. 1932, 61 F.2d 194, 195.

The right to recover these expenses has been recognized as a separate cause of action on behalf of the person who actually paid the bill in some states under the common law. Anno. Common-law recovery of funeral expenses, 3 A. L.R.2d 932. Prior to *The Harrisburg*, recovery of these expenses was permitted under the general maritime law. See, e. g. Keene v. The David Reeves, D.C.Md.1879, Fed.Cas.No.6,625; Anno., Common-law recovery of funeral expenses, 3 A.L.R.2d 932. The overruling of *The Harrisburg* revives those cases as guides for decision here. It need not be decided whether the statutory language that appeared to deny recovery for funeral expenses against a background of maritime law that denied death actions continues to dictate this result when the horizon is bathed by the light of *Moragne*. This result need not be adopted for non-statutory *general maritime actions* post *Moragne*. Whether denominated an expense of the survivor or the estate, funeral costs represent an actual economic loss to the plaintiff. Recovery for the funeral bill, $923.43, will therefore be permitted.

### E. Loss of Services

█ Both federal statutes permit recovery for pecuniary loss only. "Nevertheless, the word [pecuniary] as judicially adopted is not so narrow as to exclude damages for the loss of services of the [deceased]." Michigan Central R. Co. v. Vreeland, 1913, 227 U.S. 59, 33 S. Ct. 192, 196, 57 L.Ed. 417. See Sabine Towing v. Brennan, 5 Cir. 1936, 85 F.2d 478 rev'd on other grounds Van Beeck v. Sabine Towing Co., 300 U.S. 342, 57 S.Ct. 452, 81 L.Ed. 685; Prosser, The Law of Torts at 930. Unlike those for mental suffering, these damages can be definitely valued. Michigan Central R. Co., 1913, 33 S.Ct. 192, 197. This item of recovery will be permitted.

The incidental services that Mr. Dennis provided his daughter were similar to the non-sexual services a husband provides for his wife. Transportation, minor home repairs, assistance in shopping are but examples of these. The plaintiff will be permitted to recover $40 a month —$480 a year—for these, for the remainder of her father's life expectancy. Discounted at 5½%, this amounts to $5,030.40.

### F. Survivor's Grief

█ Although the plaintiff pleaded this item of damage, she introduced no proof to show any actual suffering. The defendant introduced evidence that indicated that plaintiff's psychological difficulties restrict her emotional involvement in personal relationships. Since the damage has not been proved, recovery will be denied. For the same reason this is not an appropriate case to attempt to determine whether or not recovery should be permitted as a matter of law.

Therefore damages will be allowed as follows:

| | |
|---|---:|
| 1) Loss of Support | $18,864.00 |
| 2) Decedent's pain and suffering | 20,000.00 |
| 3) Decedent's lost wages | 10,752.50 |
| 4) Funeral expenses | 923.43 |
| 5) Loss of Services | 5,030.40 |
| TOTAL | $55,570.33 |

Interest will be allowed from the date of death. The plaintiff's counsel will prepare a form of judgment and review it with opposing counsel. This opinion will serve in lieu of findings of fact and conclusions of law.

This opinion supersedes the preliminary one previously circulated to counsel for comments.