**Port POWELL, Plaintiff,**

v.

**HELLENIC LINES, LTD., Defendant.**

**Civ. A. No. 70–2868.**

United States District Court, E. D. Louisiana.

June 9, 1972.

Clifton C. Carl, William S. Vincent, Jr., Garrett, Carl & Roussel, New Orleans, La., for plaintiff.

Christopher Tompkins, Bertrand M. Cass, Jr., Deutsch, Kerrigan & Stiles, New Orleans, La., for intervenors, Atlantic & Gulf Stevedores, Inc.

James H. Roussel, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendant.

CASSIBRY, District Judge:

Adjudication of the liability issues in this case was made at the close of trial on February 23, 1972. The only matter remaining for decision is quantum of damages.

Plaintiff Port Powell, while performing duties as a longshoreman employee of Atlantic & Gulf Stevedores, Inc., sustained injuries caused by the unseaworthiness of the vessel "Hellenic Hero", owned by defendant Hellenic Lines, Ltd. On January 15, 1970 the ship's rotted and deteriorated jackstaff, a pipe about seven feet long and two inches in diameter, fell to the Mississippi River wharf in New Orleans where plaintiff

was performing loading operations for the ship, striking the plaintiff on the left cheek area and seriously injuring him. I ruled at the trial therefore that he is entitled to recover from the defendant for damages caused by his injuries. Seas Shipping v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

Atlantic and Gulf Stevedores' claim in intervention against Hellenic Lines, Ltd., for compensation and medical expenses paid to, and on behalf of, plaintiff was granted. A counter-claim of defendant Hellenic Lines against intervenor Atlantic and Gulf Stevedores for indemnity based on the breach of the warranty of workmanlike service by failing to require the plaintiff to wear a hard hat was denied because it was shown by a preponderance of the evidence that the failure to wear a hard hat did not contribute to the injury in this case. On the contrary the evidence convinced me that a hard hat would have been no protection against the blow to the cheek area received by plaintiff. There was no basis for recovery on this counter-claim therefore under Ryan Stevedoring Co., Inc. v. Pan-Atlantic SS Corp., 349 U.S. 901, 75 S.Ct. 575, 99 L. Ed. 1239 (1955).

The dispute as to quantum exists mainly because certain of the symptoms continuing after plaintiffs' initial treatment, and which he contends prevent him from working, are subjective— headaches and dizziness—and because the defendant contends that visual problems of the plaintiff were not caused by the accident.

The plaintiff was 54 years old at the time of the accident, and for the two years previous thereto he had earned wages averaging $8,364.00 per year. The blow that he received was severe enough to render him unconscious, cause a cerebral concussion, a fracture of the anterior wall of the left maxillary sinus— a sinus bone—in the left cheek through which the roots of teeth go, and the loosening of two teeth so that they had to be removed. There is evidence that the plaintiff remained unconscious un-

til the ambulance arrived, a period estimated to be as long as 30 minutes.

The plaintiff was taken to the emergency room of Touro Infirmary in New Orleans and was first examined there by Dr. Samuel A. Romano, a general surgeon. The plaintiff was then conscious, but dazed, had an obvious head injury with a large hematoma involving the whole left cheek, had a neck sprain and some injury to the teeth, but this latter injury was considered less important than his other injuries for immediate treatment. Dr. Romano admitted the plaintiff to the hospital and called a neurosurgical expert, Dr. Richard W. Levy, to examine him. Dr. Levy found no scalp or skull injury and considered plaintiff's muscle reflexes and his mental status to be good except for amnesia which prevented him from recalling details of the accident. The plaintiff complained to him of pain over his entire body.

Powell remained in the hospital until February 1, and the complication of infection of the soft tissues in his cheek added to the pain from his injury on the left side of his face. Dr. Harry Zoller, an ear, nose and throat specialist, was called in consultation three days after the accident. He stabbed the soft mass, which he described as being the size of two large pecans, to drain the infection, an extremely painful procedure, according to him, and in his words "Powell almost hit the ceiling." During the remainder of his treatment at Touro he complained mostly of his painfully swollen face. He was treated with antibiotics, anti-inflammatory medicines and muscle relaxants.

On February 4, 1970 Powell's injury to his teeth was checked by the dentist Dr. Sidney S. Light. The area where the two left upper jaw teeth were loosened was so swollen and painful that the extractions could not be made that day. He gave Powell an antibiotic and a pain reliever. In spite of the medication the plaintiff had a recurrence of the mass swelling and intense pain on February 13 and he was hospitalized at

the Ear, Nose and Throat Hospital in New Orleans from February 13 through 19. This relapse caused a large swelling described as the size of an orange or grapefruit. He had a sinus infection which the injury had caused to flare up, and Dr. Zoller made a place for the sinus to drain by a simple surgical procedure performed at the Ear, Nose and Throat Hospital and continued the antibiotic treatment.

By February 17 the swelling and pain had subsided sufficiently for Dr. Light to extract the two loose teeth. These teeth have the longest roots in the mouth and it requires a severe blow to loosen them according to Dr. Light. An antibiotic was prescribed after the extractions and Powell had residual post-operative pain in the soft tissues that took six weeks to heal. Dr. Light provided Powell with a removeable partial bridge on April 2 that required no adjacent grinding.

Dr. Romano continued to see Powell after he left Touro and in the period from February 4 to May 12 he saw him approximately 36 times. The plaintiff complained of headaches and loss of the sense of smell. Doctors Levy and Zoller tested him and confirmed that he had lost his sense of smell. Dr. Levy testified that a head injury can cause this loss, and that the blow received by Powell in this case was severe enough to tear the nerves of smell from the bone just above the nose. Once the sense of smell is lost, it cannot be regained and its loss affects and diminishes the sense of taste also.

The plaintiff complained of headaches and dizziness throughout the time that Dr. Romano treated him. According to the doctor's testimony, his impression from the plaintiff's complaints was that the headaches were not constant, but were brought on by exertion over a long period.

Powell was referred by Dr. Romano to Dr. Moss L. Antony, an ophthalmologist, for eye evaluation. Dr. Antony saw him twice in June 1970. Powell was complaining that his eyes would not permit him to read for any length of time and that he was unable to see after bending. Dr. Antony's only treatment of Powell was to give him bifocal correction. His examination of the plaintiff revealed no injury to the eyes or to the visual system. He found no turning in or out of the eyes and his tests detected no double vision. He regarded Powell's lenses as normal for a person his age and no cataracts were evident.

In September and October Dr. Romano discussed returning to work with the plaintiff several times and recommended that he try it. The facial swelling had subsided and Dr. Romano thought that he had improved. In November when Powell attempted to resume his job as a "hook-up" man, however, he had to stop working after an hour. He was unable to stoop over and hook up loads—bending over, looking up and holding his head back made him dizzy.

Dr. Robert Azar, an ophthalmologist whose practice included much work relating to eye trauma, examined the plaintiff in January 1971 for his eye complaints of blurring and double vision, tearing and sensitivity to light. He found a small opacity in the lense of the left eye suggesting early formative stage of a cataract. The plaintiff also had muscular imbalance of the eyes, or drift out, which he explained as the eyes drifting away from each other. According to Dr. Azar this handicaps the plaintiff in seeing anything within two or three feet, affects his close seeing in other words, and would have an adverse effect on his ability to work. He explained that this drifting out can cause dizziness because it interferes with the integration of the images seen simultaneously by each eye and the patient then sees double which is a common cause of dizziness. Muscular imbalance can be corrected by surgery and he testified that he probably recommended surgery to the plaintiff, but could not recall that advice definitely.

In June 1971 Dr. Romano released the plaintiff and told him to go back to work.

His impression was that plaintiff's condition was better than when he had made the previous attempt to work—his headaches were not constant and the dizzy spells occurred only occasionally. Toward the end of Dr. Romano's treatment medication was given mostly for headaches— mild sedative compounds. All the doctors (apparently he, Zoller, Levy and Antony) agreed that Powell did not need more treatment and nothing would be gained by it. They were of the opinion that he should try to work although he continued to have headaches and some dizziness.

Powell made no effort to return to work, but in the latter part of July he was seen by a neurologist, Dr. Max Johnson, and in August he was seen by Dr. Joseph E. Schenthal who specializes in internal medicine, by Dr. Monte G. Holland, Chairman of the Department of Ophthalmology at Tulane University, and again by Dr. Azar.

Dr. Johnson's testing confirmed that that plaintiff had lost his sense of smell. The neurological examination was normal except for the function of the olfactory nerve, and gross eye and ear examination showed no eye or ear disorders. The tests he conducted ruled out any reason for the subjective complaints of headaches and dizziness except that they were post-concussion residual. He accepted these continuing complaints as possible with the type of injury plaintiff had sustained. Dr. Johnson saw Powell again in December and in January 1972 and his tests indicated no neurological changes.

Dr. Schenthal's testing also revealed the loss of the sense of smell and ruled out causes for headaches and dizziness except post-concussion residual, and he considered his complaints to be consistent with his injury. He did not check the plaintiff for drifting eye. He saw the plaintiff several more times before trial and his complaints were consistent and the same. The plaintiff was aging rapidly in his opinion.

Dr. Holland saw the plaintiff on August 26 on Dr. Schenthal's referral. He found a cataract forming in the left eye, but the lense of the right eye. was within normal limits. He found no muscle imbalance. An examination four months later showed no progression of the cataract.

Dr. Azar found in August that the cataract forming in the left eye had increased in density in the six months since his first examination and that new cataracts were forming. His tests indicated an 8.5 percent loss of the visual efficiency in that eye. The lense of the right eye remained normal, but the muscle imbalance was still present.

In January 1972 Dr. Antony again examined plaintiff's eyes and found cataracts forming in both of them which diminished plaintiff's visual acuity. Dr. Levy reexamined him in January also and could find no neurological basis for his continuing headaches and dizziness.

A psychologist, Dr. Irving A. Fosberg, administered psychological tests to the plaintiff in December 1971. From the results of verbal and performance intelligence tests and a dexterity test, Dr. Fosberg concluded that the plaintiff has limited job opportunity, can only do manual labor and, if he is physically unable to do that, he is seriously disadvantaged in the labor market. He also evaluated the plaintiff as having an insufficient personality, poor judgment, and little or no emotional or physical stamina.

At the trial Powell testified that he cannot smell at all and that his food has no flavor. The headaches come and go, but he has them every day and they are worse at night. He cannot sleep without medication and at the time of trial he was taking medication prescribed by Dr. Johnson. He gets dizzy even when he attempts to help with the housework and he is convinced that he cannot work.

All counsel have stipulated that medical expenses incurred by Port Powell on account of his injuries total $3938.17, of which $3434.17 has been paid by intervenor, Atlantic & Gulf Stevedores, Inc.

The plaintiff contends that he is entitled to additional damages as follows:

| | |
|---|---|
| Pain and suffering from the facial injury, including fracture of the sinus bone | $12,500.00 |
| Loss of two teeth and pain and suffering during healing | 3,500.00 |
| Loss of sense of smell | 25,000.00 |
| Effects on taste | 20,000.00 |
| Post concussion syndrome | 40,000.00 |
| Injury to eye | 25,000.00 |
| Total loss of wages for remainder of worklife | 66,728.00 |
| | $192,728.00 |

The defendant contends that, because of the conflict in the medical evidence, Powell has not proved that he is disabled at this time, nor has he proved that his eye difficulties are caused by the trauma resulting from the accident. Except for the subjective complaints of headache and dizziness, the plaintiff has been recovered since November 1970, according to the defendant, and the damages awarded should not exceed $12,000.00. In the alternative, if the court finds that Powell is presently disabled from returning to work as a longshoreman, defendant contends that damages should be limited to $35,000.00 in view of the conflict in the medical evidence as to the cause and extent of Powell's problems.

## PAIN AND SUFFERING IN INITIAL TREATMENT

There is no dispute that the plaintiff suffered a severe and painful injury and that the pain from the hematoma and the fractured facial bone was aggravated by the complication of infection and by the extraction of the two teeth. The swelling apparently did not completely subside for several months. The plaintiff suggests that the pain and suffering from the injury to the teeth be separated from the pain and suffering from the other effects of the injury. This does not appear to be warranted in this case. The plaintiff had an extended period of pain in the left jaw area, including pain in the convalescent period following extraction of the teeth, but the evidence does not reveal that the pain from that period can be separated from the pain experienced generally from the injury. The loosening of the teeth and their extraction did cause favoring of the left side of the mouth in eating that was a part of the inconvenience and suffering during this initial period. I am of the opinion that $10,000.00 will adequately compensate plaintiff for the pain and suffering during the initial treatment period following the injury.

## LOSS OF TWO TEETH

The requested amount of $1,000.00 for the loss of the two teeth is reasonable and that amount will be allowed.

## LOSS OF SENSE OF SMELL

The evidence that plaintiff has lost his sense of smell is not disputed. The plaintiff asks that the loss of this sense be separated from the effect it had on his sense of taste. Since these matters are so interrelated, I will consider them as one item.

The plaintiff appropriately points out that the loss of the sense of smell makes him vulnerable to dangers which he would normally be alerted to by this sense. In one instance since the accident the plaintiff was unable to detect a gas leak in his home. Loss of this sense also deprives him of the pleasure of pleasant odors, such as food cooking and the fragrance of flowers, and it reduces his enjoyment of food because the taste of food is conveyed largely through the sense of smell. The plaintiff will be awarded $30,000.00 for this loss.

## POST–CONCUSSION SYNDROME

The basis for plaintiff's continuing complaints of headaches and dizziness could not be found in the neurological testing performed by Drs. Levy, Johnson and Schenthal. Dr. Azar found drift-

out of the eyes which could, in his opinion, produce dizziness.

Dr. Levy considered that the headaches and dizziness induced by the injury should have subsided four months after the accident. Dr. Johnson's experience was that, in case of injury as severe as plaintiff had suffered, the time of recovery from post-concussion residual symptoms such as headaches and dizziness is uncertain. In some individuals the headaches last only a short time, in others they may extend over a period of years—with some even having complaints after five years. He accepted plaintiff's subjective complaints as post residual effect of the injury, but he did expect the plaintiff to improve, although he could not say definitely when he would improve.

Dr. Schenthal testified that there is no medical way to determine exactly what causes plaintiff to continue to have headaches and dizziness, but he considered the complaints were consistent with the concussion he had suffered. The severe blow plaintiff received could sufficiently move the very soft tissue by which the brain is attached, he explained, to lift part of the brain enough to cause these continuing symptoms. Although the plaintiff did not impress him as being in any acute distress, he was of the opinion that the symptoms could be permanent.

Dr. Levy's opinion that plaintiff's symptoms should have ceased was based on his impression that the plaintiff had been rendered unconscious from the blow for a matter of only a few minutes. He testified that the longer a person who suffers a concussion is unconscious, the more severe and long lasting will the symptoms be. The evidence shows that the plaintiff could have been unconscious for as long as thirty minutes. Dr. Levy's opinion that the injury could not be the cause for the continuing symptoms is therefore weakened.

Considering that the headaches are intermittent and are relieved by mild sedatives, that the dizziness is not constant, that the duration of these symptoms cannot be fixed with any degree of certainty and that the plaintiff is expected to improve in time, I am of the opinion that $15,000.00 is adequate compensation for the post-concussion syndrome of the plaintiff.

## THE EYE PROBLEMS

This item of damage presents a serious conflict in the evidence. Dr. Azar impressed me as having the most expertise of the ophthalmologists in the area of trauma induced eye injury. His testing of the plaintiff was more refined and detailed also than that of Dr. Antony and Dr. Holland. His reasons for finding that the cataract formations in the left eye were trauma induced rather than senile appeared to be more reasonable than the reasons of the other two doctors for concluding that they were senile cataract formations.

Dr. Azar found a "water cleft"—a droplet of water in the lense—in the left eye indicating cataract formation when he first examined plaintiff in January 1971. A blow to the head from a pipe as large as the one that hit plaintiff in this case could be expected to produce cataracts, according to Dr. Azar; the time of formation was consistent to its being induced by trauma, and senile cataracts ordinarily commence in people 10 years older than Powell. The progression of the cataract formation in six months convinced Dr. Azar that the injury had caused it. The right eye remained normal in all his examinations. This further corroborated trauma inducement to him because senile cataracts usually manifest themselves in both eyes.

In August 1971 Dr. Holland found a cataract forming in the left eye only, and there was no progression four months later. His principal reason for finding that the cataract formation was not caused by the injury was that a thick layer of cortex appears behind the lense

if it is trauma induced, and he found the cortex to be clear. But he did admit that this one could have been caused by the injury, that it had characteristics consistent with both traumatic and senile cataracts, and that Dr. Azar, because of the time of his examinations, is in a better position to evaluate its progression.

Dr. Antony did not consider that the cataract formation was caused by the injury because he found no evidence of it when he first examined plaintiff in June 1970, and when he detected it in January 1972, he considered that both eyes were affected indicating senile cataract.

I accept the opinion of Dr. Azar that the cataract was caused by the injury.

All eye doctors agreed that his visual acuity will deteriorate with the progression of the cataracts. If surgical removal becomes necessary his work efficiency will be affected.

Dr. Azar was the only ophthalmologist to find muscle imbalance, or drift out, of the eyes. He testified that this is seldom found except as a result of trauma and his tests suggested that the plaintiff's muscle imbalance had come on during his adult life. Nothing in plaintiff's history indicated that this was caused by anything other than trauma, and he considered it was caused by the injury. I accept Dr. Azar's finding and opinion on muscle imbalance.

■ Inasmuch as the progression of the cataracts cannot be precisely forecast and the muscle imbalance is correctible by surgery, $10,000.00 will be awarded for this damage.

## LOSS OF WAGES

The evidence convinces me that the plaintiff cannot now do longshoreman's work because of the dizziness. Plaintiff's foreman Murphy Bowman testified as to the inability of anyone affected by dizziness to work in his gang. Such a person would be a danger to himself and to his fellow workers, and Bowman would not select such a person to work under him. Furthermore, plaintiff's psychological makeup, together with the severity of the injury he received, make it most unlikely that he will ever again be able to do the hard manual labor of a longshoreman.

■ Dr. Johnson was of this opinion. He pointed out also that head injury reduces stamina and flexibility in any person. In his words head injuries "take something out of a person", and this is more serious if the injury occurs to an older person and to a person with a low I.Q. who adjusts after injury with difficulty. He expected the plaintiff to improve, but he could set no time for the improvement. Dr. Schenthal also considered that plaintiff's injury had disabled him from doing the work of a longshoreman. I find therefore that the plaintiff will be disabled from returning to longshoreman's work during the remainder of his worklife.

■ There is a duty on the part of the plaintiff, however, to minimize his damages by doing work that he can perform. He has not tried to do other work than longshoreman's since the accident, and his complaints to all the doctors who saw him close to the time of the trial and his testimony at the trial show that he considers himself too disabled from the dizziness to do work of any character, even assisting with household chores.

■ Under these circumstances plaintiff will be given full wages for three years from the injury, and thereafter they will be reduced by the minimum wage of $1.60 per hour, which amounts to approximately $3200 per year.

■ The defendant argues that the net wages, after income tax deduction,

should be regarded as the wage loss, citing Dennis v. Central Gulf S.S. Corp., 323 F.Supp. 943 (E.D.La.1971), aff'd 453 F.2d 137 (5th Cir., 1972). In that case the wage earner was deceased and the court was considering the loss of support suffered by the wage earner's dependent daughter. It was therefore appropriate under those circumstances to consider the net income rather than the gross income in determining how much the wage earner contributed to his daughter's support. Recovery for loss of wages for the wage earner himself, however, contemplates gross earnings. United States of America v. Bonner, 339 F.Supp. 640 (E.D.La., 1972).

The plaintiff shall therefore be awarded the following for loss of wages:

| | | |
|---|---:|---:|
| Past (2 yrs. full wages) | | $16,728.00 |
| Future | | |
| 1-year full wages | $ 8,364.00 | |
| 8 years (less min. wage) | 41,312.00 | |
| | $49,676.00 | |
| Less ⅓ reduction (Discount, inflation, pay raises, less working as aging progresses) | $16,555.00 | 33,121.00 |
| | | $49,849.00 |

RECAPITULATION:

| | |
|---|---:|
| Medical | $ 3,938.17 |
| Initial pain and suffering | 10,000.00 |
| Loss of teeth | 1,000.00 |
| Loss of sense of smell | 30,000.00 |
| Post-concussion syndrome | 15,000.00 |
| Eye damage | 10,000.00 |
| Loss of wages | 49,849.00 |
| | $119,787.17 |

In addition to the stipulation of medical expenses paid by Atlantic & Gulf Stevedores in the amount of $3434.17, it was also stipulated that Atlantic & Gulf had paid to the plaintiff the amount of $3530.00 in compensation.

It is therefore ordered that judgment be rendered in favor of plaintiff Port Powell and against defendant Hellenic Lines, Ltd., in the amount of $112,823.-00; in favor of intervenor Atlantic & Gulf Stevedores, Inc., and against defendant Hellenic Lines, Ltd., in the amount of $6964.17; and in favor of intervenor Atlantic & Gulf Stevedores, Inc., and against defendant Hellenic Lines, Ltd., dismissing the counter-claim of Hellenic Lines, Ltd.