**Donald J. ERICKSON and Edith M. Erickson, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 78–4026.

United States District Court, D. South Dakota, S. D.

Dec. 31, 1980.

Carleton R. Hoy and Edwin E. Evans, Davenport, Evans, Hurwitz & Smith, Sioux Falls, S. D., for plaintiffs.

Raymond P. Murley, Asst. U. S. Atty., William H. Ranney, Jr., Dist. Counsel, Veterans Administration, and Bruce W. Boyd, Asst. Dist. Counsel, Veterans Administration, Sioux Falls, S. D., for defendant.

NICHOL, Senior District Judge.

This action was instituted under the Federal Tort Claims Act, 28 U.S.C. section 2671 et seq., by the plaintiffs, Donald J. Erickson and Edith M. Erickson, against the defendant, United States of America, for personal injuries sustained by the plaintiff, Mr. Erickson, while a patient at the Veterans Hospital in Sioux Falls, South Dakota, and for loss of consortium sustained by Mrs. Erickson.[1] More specifically, Mr. Erickson alleges that the negligence of the defendant's

employees resulted in the amputation of both his legs below the knee. Further, that as a result of the amputations, Mr. Erickson experienced, and will continue to experience in the future, pain and suffering, mental anguish, and impairment of earning capacity. Plaintiff seeks monetary relief.

Trial was had before the Court without a jury. Therefore, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

The plaintiff, Donald Erickson, is 48 years old, married, and the father of three children. He is, and has been all his life, a fourth generation farmer on land he presently owns and farms. He is a veteran of the Korean War.

It was in Korea that Erickson first experienced problems with his left knee. On September 12, 1954, in an evacuation hospital, surgery was performed on the knee. Upon his honorable discharge, Erickson received a ten percent service connected disability rating with respect to the knee.

In the years following the surgery in Korea, Erickson experienced difficulty with the knee. In the spring of 1976 his family physician told him that surgery would be necessary. Erickson then made an appointment at the Veterans Hospital in Sioux Falls and was examined at an out-patient clinic on April 5, 1976, by Dr. Frederick R. Entwistle. On July 8, 1976, Erickson was admitted to the Veterans Hospital.

Upon his admittance to the Veterans Hospital, Erickson was examined by Dr. Steven J. Savonen, who testified that Erickson was in excellent health except for the painful knee. Erickson had no past history of chest pains or heart problems. Two electrocardiograms (hereinafter EKG) done upon his admittance were normal.

On Wednesday, July 21, 1976, Dr. Savonen, under the supervision of Dr. Entwistle, performed surgery on Erickson's knee. A small cyst on the medial aspect of the left

---

1. Since it is undisputed that Edith Erickson failed to exhaust her administrative remedies as required by 28 U.S.C. section 2675(a)(1976), that claim is dismissed and this opinion will contain no discussion of it.

knee was removed. The surgery was uneventful. The day following surgery Erickson was walking without the assistance of crutches.

On Friday, July 23, 1976, Erickson began feeling poorly. His condition continued to deteriorate until six days later, on July 29, 1976, he suffered a severe myocardial infarction (heart attack) and developed cardiogenic shock. The progress notes in the hospital records contain no entries and there is no indication that Erickson was seen by a physician from July 22, 1976, at 2:00 p. m., until July 25, 1976, at 9:30 a.m.

On Saturday, July 24, 1976, Erickson developed a fever. He felt worse than the previous day and had problems sleeping. When he approached a nurse with his problems he was told that all he needed was a teddy bear. Erickson's wife also testified that he felt poorly that day.

On Sunday, July 25, 1976, Erickson's temperature continued to rise. Tylenol No. 10 was prescribed. Erickson felt continually worse and was unable to get out of bed. Over the weekend there is no record of Erickson being seen by a physician. Dr. Savonen testified that he was not on duty over the weekend and did not see Erickson until Monday.

In this context it is important to note the testimony of Dr. Larry Sittner, an expert witness called on behalf of the plaintiff. Dr. Sittner is a teacher at the medical school, a member of the Credentials Committee and chairman of the Professional Care Committee at a Sioux Falls hospital. In that capacity he reviews the standard of care given patients in the hospital. Dr. Sittner testified that Sunday was a critical day at which time affirmative action should have been taken to diagnose and treat Erickson's deteriorating condition. The progress notes, however, contain no entry of Erickson's condition.

On Monday, July 26, 1976, Erickson's temperature reached approximately 102°. Dr. Savonen ordered an Intermittent Positive Pressure Breathing (IPPB), a machine that keeps the lungs expanded. Dr. Savonen assumed that the temperature was due to pneumonitis. No additional tests were ordered.

On Tuesday, July 27, 1976, Erickson told the nurse on duty that he felt bad; ached all over. The nurse observed that Erickson appeared pale and continued to have an elevated temperature. Dr. Savonen ordered a blood count and a chest x-ray. He did not feel Erickson's paleness was significant. Dr. Sittner testified that these and further measures such as arterial blood gases and an EKG should have been done days earlier.

On Wednesday, July 28, 1976, Dr. Savonen removed the sutures from Erickson's knee and informed him that he could go home as soon as his temperature went down. Mrs. Erickson testified that at that time she felt that her husband was extremely ill and that his condition was deteriorating. Later, that same evening, Dr. Savonen was recalled to Erickson's room. Erickson was experiencing shortness of breath and general malaise; his complexion was dusky. He had been feeling this way for days. Dr. Savonen then ordered a decongestant, arterial blood gases, a blood culture for that night, and a chest x-ray and urinalysis for the next morning. The doctor himself testified that he did not order the tests earlier because he was waiting to see if Erickson's temperature would go down.

The early morning progress notes of July 29, 1976, indicate that Erickson was in respiratory distress, his pulse was weak, and his blood pressure was faint. The notes further indicate that his condition was the same as when he was examined by Dr. Savonen a few hours earlier. The only prescribed treatment at that time, however, was to continue monitoring the IPPB unit. By 2:00 a. m. Erickson's blood pressure had dropped to 86 over zero; a diastolic beat could not be heard. At 3:00 a. m. his condition was unchanged and Dr. Savonen was recalled. The nurse testified that she did not call the doctor earlier because Erickson's condition was the same as when the doctor examined him before midnight.

Dr. Savonen arrived at 4:30 a.m. at which time he felt that Erickson's condition had changed remarkably. He diagnosed the symptoms as a pulmonary embolism. After reading the EKG he realized that Erickson was experiencing an acute myocardial infarction. He then moved Erickson to the intensive care unit where Dr. Waheed Sahibzada, a cardiologist, assumed primary responsibility for the patient.

In reviewing the care of Erickson up to the point of his transfer to the intensive care unit, Dr. Sittner testified that Erickson was seriously ill on the fourth post-operative day, which was July 25, 1976. This was four days prior to his heart attack. At this time, Dr. Sittner testified Erickson was showing symptoms of a developing pulmonary embolism. If affirmative action had been taken to diagnose and treat the embolism, the testimony showed, there was a reasonable degree of certainty that the heart attack could have been avoided.

In the intensive care unit, Erickson was given Heparin for the pulmonary embolism and Dopamine for the heart attack. The effect of Dopamine is to increase the muscle performance of the heart and the blood flow to the kidneys and the brain, at the expense of peripheral circulation. In lay terms, Dopamine increases the blood pressure. It is undisputed that the high dosage amount of Dopamine over an 80 hour period caused severe vasoconstriction in the lower extremities resulting in irreversible ischemia or wet gangrene. This led to the bilateral modified Symes' amputations. Defendant argues, however, that the use of Dopamine was vital to maintaining Erickson's blood pressure and keeping him alive.

Dopamine was initially administered on July 29, 1976, at 9:15 a. m. at the rate of 15.52 micrograms. Fifteen minutes later the dosage was doubled to 31.05 micrograms. The Dopamine was continued until August 1, 1976, at 9:45 p. m. when Dr. Costas Assimacopoulous, chief of surgery, ordered it discontinued after he was consulted about the vasoconstriction problem.

During the 80 hour period that the Dopamine was administered, Erickson's hands and feet were ice cold and white. He complained of tingling and numbness in his legs and toes approximately twelve hours after the Dopamine was initially administered. By July 31, 1976, at 9:00 p. m. Erickson had to be given morphine for the pain in his feet. Additional morphine was given when he later complained of cramping in his feet. By evening of the same day his nailbeds were cyanotic. By August 1, 1976, the record reflects that Erickson's feet and lower legs were mottled and more cyanotic. No pulse could be heard in those areas. One note entered at 5:00 p. m. on August 1, 1976, indicated that the patient's feet were purple. Nevertheless, the Dopamine was continued.

During the evening of August 1, 1976, Dr. Assimacopoulous saw Erickson for the first time. He issued an immediate order that the Dopamine be decreased and thirty minutes later he ordered it discontinued. He then ordered Dr. Rahat Sahibzada, an anesthesiologist, to perform an epidural block in an attempt to reverse the effects of the Dopamine. This was unsuccessful and no further attempt at reversing the effects of the Dopamine were made. On August 26, 1976, Dr. Assimacopoulous and Dr. Savonen performed an amputation on both legs at approximately ankle level.

Dr. Sittner testified that based on his review of the records there was no justification established for the use of Dopamine. He noted that before administering Dopamine, it should be determined whether the patient is suffering from hypovolemia, i. e., a decrease in the amount of circulating fluid in the bloodstream.

One of several methods used to determine whether a patient suffers from hypovolemia is by use of a Swan-Ganz Catheter. Another method is the insertion of central venous pressure lines. Although both were attempted on Erickson, the records indicate that the Swan-Ganz Catheter was not working, and Dr. Sittner testified that the erratic measurements of the central venous pressure line indicated to him that it was also malfunctioning. Thus, Dr. Sittner testified that hypovolemia was never ruled out

as a cause for Erickson's low blood pressure. Dr. Sittner further testified that in many cases Dopamine is not the drug to use, that intravenous fluids may be used to increase the patient's blood pressure. He could not find any indication in the records that this was even attempted.

Instead, Dr. Sittner continued, a large dose of Dopamine was prescribed and a short time later this dosage was doubled to what he felt was an excessive dosage. Dr. Talley, a cardiologist employed by the Veterans Hospital, testified that the recommended dosage of Dopamine in the Physician's Desk Reference Book was two to five micrograms, and that the dosage given Erickson was over six times that amount. He continued to maintain, however, that such a dosage was necessary to keep Erickson alive, although he did agree with medical literature that indicates that Dopamine should be discontinued in favor of alternative forms of treatment in this case when severe vasoconstriction became apparent in Erickson; nor was Regetine or other means used to counteract the effects of the Dopamine.

On August 26, 1976, Dr. Assimacopoulous performed bilateral modified Symes' amputations, i. e., ankle level amputation, on Erickson. Dr. Assimacopoulous testified that although the level was not ideal for the fitting of prosthetic devices, he felt it was necessary to amputate where the least amount of blood loss would occur in light of the prior myocardial infarction. Dr. Assimacopoulous never consulted either a cardiologist or an orthopedic surgeon in this matter. Following the amputations Erickson remained in the hospital until October 5, 1976, at which time he was transferred to the Veterans Hospital in Minneapolis, Minnesota.

The level of amputation caused numerous problems. The hospital in Minneapolis was unable to fit Erickson with prostheses for some time. Later, he received temporary prostheses, but they substantially increased his height. At one point Erickson was told that the level of amputation should be revised. Dr. Assimacopoulous also testified that the stumps may have to be revised. Erickson was finally released from the Minneapolis Hospital on November 12, 1976, four months after entering the Sioux Falls hospital for removal of a cyst from his knee.

Jurisdiction over Federal Tort Claims Act cases is vested in this Court by virtue of 28 U.S.C. section 2671 (1976) and section 1346(b) of the same title. It is stipulated by both parties that Donald Erickson has exhausted his administrative remedies as required by 28 U.S.C. section 2675(a) (1976). It is further stipulated that Edith Erickson failed to exhaust her administrative remedies as to her claim for loss of consortium and thus her claim is dismissed pursuant to 28 U.S.C. section 2675(a) (1976).

The plaintiff in an action instituted under the Federal Tort Claims Act, 28 U.S.C. section 1346(b) (1976), must prove six elements by a preponderance of the evidence.[2] The only controverted element in the present case is whether the injury sustained by Erickson was caused by a negligent or wrongful act or omission on the part of the defendant. It is Erickson's contention that among other things the defendant was negligent in failing to use the requisite degree of care and skill in diagnosing and treating his illness. Such negligence, Erickson alleges, resulted in the loss of his legs.

 In deciding questions of negligence under the Federal Tort Claims Act

2. 28 U.S.C. section 1346(b) (1976) provides as follows:

Subject to the provisions of chapter 171 of this title, the District Courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions and claims against the United States, for money damages, accruing on and after January 1, 1945,

for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

the law of the place where the alleged act occurred governs the Court's decision. *Hungate v. U. S.*, 626 F.2d 60 (8th Cir. 1980); *Donham v. U. S.*, 536 F.2d 765 (8th Cir.), aff'd 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665, *rehearing denied* 434 U.S. 882, 98 S.Ct. 250, 54 L.Ed.2d 168 (1976). The standard of care that South Dakota law exacts from a physician is that in performing professional services for a patient, including diagnosis, care, and treatment, a physician or surgeon has the duty to use that degree of care and skill ordinarily exercised in similar cases by other members of his profession in the same or similar locality. *Fjerstad v. Knutson*, S.D., 271 N.W.2d 8, 14 (1978); *Block v. McKay*, 80 S.D. 469, 476, 126 N.W.2d 808, 811 (1964). Although physicians are not to be held responsible for results, they are responsible for the kind of services rendered by them. *Block v. McKay, supra; Dean v. Seeman*, 42 S.D. 577, 581, 176 N.W. 649, 650 (1920).

On July 23, 1976, two days after surgery on his knee, Erickson began feeling bad. On the third postoperative day his temperature was elevated. Although he grew progressively worse there are no entries in the hospital records and there is no indication that Erickson was seen by a physician for a three day period ending July 25, 1976, by which time he was unable to get out of bed. One of those days was termed by Dr. Sittner as the critical day when affirmative action should have been taken to diagnose and treat Erickson's deteriorating condition. Upon approaching a nurse during this period, Erickson was told that all he needed was a teddy bear. By July 27, Erickson was observed as pale and with a continually elevated temperature. On this day, four days after the symptoms appeared, Dr. Savonen ordered tests done. Dr. Sittner testified that these should have been done days earlier. Finally on July 29, Erickson began having difficulty breathing and complexion was not good. He testified that he told the doctor that he had been feeling this way for days. Only then were tests ordered. Further, the progress notes indicate that when the final crisis occurred, i. e., the myocardial infarction, the patient looked the same as

he had hours earlier when examined by Dr. Savonen. He was in respiratory distress, his pulse was weak, and his blood pressure was 86 over zero; a diastolic beat could not be heard. According to the nurse on duty Erickson had been this way for hours.

Four days prior to his suffering a myocardial infarction Erickson showed symptoms of a developing pulmonary embolism. Had affirmative action been taken to diagnose and treat the embolism there is a reasonable degree of certainty that the myocardial infarction could have been avoided. Although the defendant argues that there was no embolism, the only test done was an inconclusive lung scan. The area where the scan did not reach was later diagnosed by a radiologist, through an x-ray, to have been an embolism. By failing to take affirmative action and adequately diagnose the embolism, defendant's diagnosis and treatment of Erickson fell below that degree of care and skill ordinarily exercised in similar cases by other physicians in the community. *Fjerstad v. Knutson, supra; Block v. McKay, supra.* This constitutes negligence in the services rendered Erickson. *Block v. McKay, supra; Dean v. Seeman, supra.* Only if a patient is adequately examined is there no liability for an erroneous diagnosis. *Hicks v. U. S.*, 368 F.2d 626 (4th Cir. 1966). The undiagnosed embolism led to the myocardial infarction resulting in the use of the Dopamine which undisputedly led to the amputations of Erickson's lower limbs. Thus the negligence of the defendant was the proximate cause of Erickson's injury. *Voegeli v. Lewis*, 568 F.2d 89, 94 (8th Cir. 1977).

The record further supports the defendant failed to use due care in the treatment of Erickson's myocardial infarction. First, as Dr. Sittner testified, no methods other than the Dopamine were ever attempted in the treating of the condition. Second, the record contains no indication that conclusory tests were performed to establish the necessity for using Dopamine. Instead excessive amounts of Dopamine were administered to Erickson over an exceedingly long period of time, despite readily apparent con-

traindications. It is undisputed that the Dopamine, administered over an 80 hour period resulted in the wet gangrene in Erickson's lower legs, which led to the amputation.

In sum, the diagnosis, care, and treatment given Erickson by the defendant in the period leading up to and following his myocardial infarction amply indicate to this Court that the defendant was negligent. *Fjerstad v. Knutson, supra; Block v. McKay, supra.* The negligence of the defendant in failing to diagnose and treat, early on, the symptoms of the embolism resulted in Erickson's suffering a myocardial infarction. The excessive use of Dopamine in treating the myocardial infarction without establishing its necessity and for over such a lengthy period of time despite the fact that Erickson's legs were mottled, discolored, and cyanotic demonstrates a lack of due care on the part of the defendant. Such lack of due care proximately caused the amputations of Erickson's lower limbs. *Voegeli v. Lewis, supra.*

■ The Court now turns to the question of damages. The defendant raises a number of issues regarding the granting of damages. First, the defendant argues that since Erickson has failed to make any effort to secure employment other than farming he has not made the required attempt to mitigate his damages. The defendant relies on the case of *Baker v. Baltimore & Ohio Railroad Company,* 502 F.2d 638 (6th Cir. 1974), for the proposition that in determining loss of future earning power a court should look to whether the injured party is attempting to secure gainful employment. The Court in that case, however, went on to state that they would "decline to adopt a rule that manual laborers who are injured and prevented from returning to their chosen line of work are foreclosed from recovering for their lost earning capacity because they choose not to pursue a new career path of speculative financial reward." *Baker, supra,* at 644. In the present case Erickson has remained gainfully employed on the farm. He is not completely foreclosed from his chosen line of work as distinguished

from the injured parties in the cases relied upon by the defendants. *See Baker, supra; Powell v. Hellenic Lines, Ltd.,* 347 F.Supp. 855 (D.La.1972).

■ Second, the defendants contend that the economic loss appraisal does not reflect a deduction for income taxes. In the absence of such, it is the defendant's contention that the appraisal of Dr. Brown, the economic expert, should be disregarded. In support of its argument the defendant cites the recent Supreme Court case of *Norfolk and Western Railway Company v. Liepelt,* 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980). In that case the Court was considering the loss of support suffered by the wage earner's dependents. It was therefore appropriate to consider net income, after deducting income taxes, rather than gross income in determining how much the wage earner contributed to his dependents' support. Recovery for loss of wages for the wage earner himself, however, contemplates gross earnings. *Varlack v. SWC Caribbean, Inc.,* 550 F.2d 171, 178 (3d Cir. 1977); *Johnson v. Penrod Drilling Company,* 510 F.2d 234 (5th Cir. 1975); *Powell v. Hellenic Lines, Ltd.,* 347 F.Supp. 855, 863 (E.D.La.1972).

The plaintiff, Mr. Erickson, sustained a serious injury as a result of the negligence of the defendant's employees. By virtue of the fact that Erickson has lost both lower legs he is no longer able to maintain his farm without the active participation of his children. The testimony shows that he cannot be outside in the winter and only for short periods of time in the summer. Because of the fear of his falling or the tractor stalling in the fields Erickson cannot do any farm work alone. In light of the above facts it appears to the Court that Erickson suffered a permanent disability, and that without the support of his family he would be required to give up his farm, which has been owned by the family for four generations.

■ It is therefore the finding of this Court that the plaintiff is entitled to damages in the amount of $500,000, distributed as follows: $190,000 for loss of future earn-

ings discounted to present value; $40,000 for loss of earnings in the years from injury to trial, which are not discounted; $270,000 for pain and suffering including disfigurement.

The Clerk of the Court may enter an appropriate judgment in accordance with this opinion.