Leo DELAHOUSSEY

v.

WESTERN GEOPHYSICAL COMPANY OF AMERICA

and

The Motor Vessel WESTERN CREST, Motor Vessel WESTERN REEF, Motor Vessel WESTERN GULF, Motor Vessel WESTERN BEACON, Motor Vessel WESTERN CAY and Motor Vessel WESTERN GEOPHYSICAL II, Defendants.

Civ. A. No. S76–365(N).

United States District Court, S. D. Mississippi, S. D.

June 29, 1979.

Harry R. Allen, Gulfport, Miss., Walter E. Ross, Jr., Biloxi, Miss., for plaintiff.

George E. Morse, Gulfport, Miss., for defendants.

## MEMORANDUM OPINION

NIXON, District Judge.

This *in personam* and *in rem* action was filed by the plaintiff Leo Delahoussey

against the defendant, Western Geophysical Company of America (WGC) and the defendant vessels owned and operated by it on which the plaintiff was employed during the times in question, for damages based upon alleged permanent and disabling bilateral, sensory-neural hearing loss resulting from the plaintiff's exposure by virtue of his being exposed to constant, excessive and dangerous noise and vibration levels while a crew member aboard the defendant vessels.

The plaintiff contends that as a crew member he was exposed to excessive and dangerous noise and vibration levels throughout his eleven and one-half years employment by WGC by virtue of the unseaworthiness of the vessels, their gear and appurtenances and the failure of WGC to provide him with a safe place in which to perform his duties as a seismographic gun operator; and that as a proximate result thereof he suffered damages consisting of past and future hospital and medical expenses, loss of earnings and employment benefits, permanent impairment of his wage-earning capacity, permanent impairment of hearing and pain and mental anguish for which he seeks damages in the sum of $500,000.00.

The defendants dispute all of the above allegations and thus deny any liability to plaintiff.

Based upon all of the evidence of record and the applicable law, this Court now proceeds to make findings of fact and reach conclusions of law as required by the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

The plaintiff, Leo Delahoussey, was employed continuously by the defendant WGC from November 24, 1964 through July 10, 1976 as a "scientific" crew member (helper and gun operator) on a number of WGC's seismographic vessels named as defendants herein, namely, the "Western Cay", "Western Geophysical II", "Western Beacon", "Western Reef", "Western Gulf", and "Western Crest" (all hereinafter referred to as "Cay", "Geophysical II", "Beacon", "Reef", "Gulf", and "Crest").

The plaintiff was born on April 8, 1926 and is a resident citizen of Biloxi, Mississippi. The defendant, WGC, is a foreign corporation authorized to do business and doing business in the "State of Mississippi and at all times during plaintiff's employment and service aboard the above vessels, owned, operated and was in charge of these vessels, all being operated upon navigable waters. Mr. Delahoussey was permanently assigned to the above vessels at various times during his employment by the defendant, and contributed to their mission, which was exclusively seismographic work. Most of the plaintiff's service was aboard the "Crest", "Beacon", "Reef" and "Gulf", each of which contained two V–12 propulsion engines, with each engine having two exhaust stacks. In addition, each vessel had two auxiliary generator engines with one exhaust stack for each.

After their purchase by WGC, the "Gulf", "Reef", "Beacon", and "Crest" were modified by the defendant by the positioning of a "shooting shack" to house the gun operators like the plaintiff, to monitor the instruments for six aqua-pulse guns utilized in seismographic operations. The shack dimensions were approximately five feet by seven feet and seven feet high, construction of ½ to ¾ inch plywood, including floors and ceilings. These shacks were mounted directly on the steel deck of each vessel approximately six feet forward of the six exhaust stacks emerging from the engine room, with the height of the stacks being only slightly higher than that of the shack.

Immediately forward of the exhaust stacks and three feet from the shooting shack were three vacuum pump engines which were continuously run during seismographic operations. These engines were mounted on a stand bolted to the deck, and the door and window of the shack opened toward the vacuum pumps and exhaust stacks. Oxygen bottles used in the seismograph operations were also located on the open deck next to the vacuum pump engines.

When the plaintiff began working for the defendant in 1964 the seismographic operations were conducted with the use of dynamite, but it is not contended herein that these dynamite blasts or shots damaged Mr. Delahoussey's hearing. In 1967 the vessels in question were modified for the use of the aqua-pulse guns and the shooting shacks were positioned as described above. Between the years 1967 and 1969, the shacks were not air conditioned and the doors thereon were always left open when the plaintiff was on station within the shack during the performance of his duties. During the time that air conditioning was available on the ships it was not used approximately six months out of the year during spring and fall operations between 1969 and the plaintiff's termination, neither was it used during the winter and summertime night operations. During all times it was not operative the shack door would be left open. This was the prerogative of the gunners, there being no regulation or rule promulgated by the defendant with reference to the opening or closing of the shack doors either during "running" of the vessels or while seismographic shooting operations were being conducted.

Subsequent to the installation of the aqua-pulse system, Mr. Delahoussey would work two six-hour shifts (six on and six off) every twenty-four hour period after the vessel went to twenty-four hour operations. His duties required him to be physically present in the shooting shack at times ranging from four to six hours during each of the six-hour shifts with the remaining time being utilized to perform maintenance on vacuum pumps and do various other work with the oxygen bottles and aqua-pulse guns and on very rare occasions to visit the engine room. His duties required him to spend approximately twenty days out of every month aboard the particular vessel to which he was assigned. Prior to 1971, when the twenty-four hour operation schedule commenced, plaintiff worked continuously during daylight hours an average of ten to fourteen hours a day, spending much of his time inside the shooting shack with the door open.

The noise that was emitted from the engines and generators through the stacks was a loud, whining noise and was approximately the same level or intensity aboard all four of the above vessels on which he performed most of his work, especially the "Crest" on which a muffler was installed on her generator exhaust stacks because of complaints of irritating noise from pleasure yachts anchored nearby. No mufflers were ever installed on the "Gulf", "Beacon", or "Reef", and none of the engine systems on any of the four vessels had been otherwise engineered to muffle or abate sounds or noises being emitted from the engines or generators stacks. Other than the engine and parts rooms, the gun operator's shooting shack was the noisiest place on each of the vessels, particularly when the shack door was open, and there was no acoustical treatment of the shack. Actually the plywood construction served as a trap for the noise emanating from the engine stacks and vacuum pumps any time the door of the shack was left open. During the time that the vessels were traveling to and from their seismographic site operations they were run at approximately 1800 r. p. m.'s and were run at approximately 1100 r. p. m.'s when the aqua-pulse guns were "streaming" during the seismographic operations.

The plaintiff experienced his first manifestation of any hearing problem in late 1969 or early 1970 when he felt that his ears "had cotton in them", at which time he did not seek medical attention and made no complaint to the defendant or anyone else concerning this problem except to his wife, who, during the next several years noticed that plaintiff's hearing problem progressively worsened inasmuch as he sometimes felt that the television was on much louder than it actually was and had problems understanding normal conversation in the presence of other external noises. However, Mr. Delahoussey did not seek any medical attention or bring this problem to the attention of anyone else and continued working for the defendant in his same capacity. In 1975, the plaintiff experienced some dizziness and went to see his family

doctor, a general practitioner, who after examining him, referred him to Dr. Harold Pace, an otolaryngologist, a specialist in the diagnosis and treatment of diseases of the ear, nose and throat, who saw Mr. Delahoussey on December 2, 1975 at Howard Memorial Hospital in Biloxi where plaintiff had been admitted by the general practitioner on November 24, 1975 because of his complaints of dizziness and the "feeling of cotton in his ears".

Dr. Pace tested the plaintiff on December 5, 1975 and diagnosed that he was suffering from severe bilateral sensory-neural hearing loss, with nerve type damage of both ears, particularly at high frequencies, that is, a nerve type deafness which was a little worse in the left than in the right ear. It was his opinion, which will be discussed in more detail later herein, that this this permanent hearing loss was probably caused by damaging noise made by the engines and generators of the defendant's vessels. Dr. Pace recommended to the plaintiff that he discontinue his work as a seismographic gunner in order to remove himself from the "hazardous noise area or levels" existing at his place of duty at the risk of becoming totally deaf. Plaintiff followed this recommendation and quit work, although he did not at that time inform his employer, the defendant, of his reason for resigning, which he did only after several months had expired in order to receive additional work-related benefits.

Mr. Delahoussey had served in World War II in the field artillery working as a "feeder" and later gunner on 105mm howitzers. He had been involved with the shooting of several rounds in training and an additional unspecified number of firings which he related to have been "several" during action as a field artilleryman. He was furnished no protective devices by the Army and utilized none, but testified without contradiction that he had never experienced any hearing problem as a result thereof or at any time until late 1969 or early 1970 while employed by the defendant as a "gunner" on its seismographic ships. He was apparently administered no hearing test upon being discharged from the service, nor any pre-employment hearing test by the defendant or any time while employed by WGC. The defendant administered no hearing tests to any of its employees either prior to or during their employment by it, and at no time during the plaintiff's employment did it have or adopt any hearing conservation program, including hearing protection devices such as muffs or ear plugs, insulation of shooting shacks, heightening of any of its stacks or any instructions during any of its safety meetings concerning recommended steps or methods for its gunners to protect their hearing in any way, although it did institute a hearing conservation or protection program subsequent to the initiation of plaintiff's claim against it.

All of the expert witnesses who have examined plaintiff for the plaintiff and defendant, agree that the plaintiff has suffered a noise-induced hearing loss in both ears, although it is agreed that the additional loss in the left ear over and above that in the right was due to some organic condition rather than any induced noise aboard the defendant's vessels. The sharp dispute between the parties herein is the source of the noise which induced the hearing loss which Mr. Delahoussey suffers. The plaintiff contends that the noise aboard the defendant's vessels caused the loss and the defendant contends that the loss was solely caused by the firing of the 105mm howitzers during World War II. In addition, there is a sharp dispute in the record as to the level or intensity of the noise, measured in d. b. a.'s [1] which was emitted from the engines and generators aboard the vessels, the experts for each side measuring different noise levels at substantially the same time in substantially the same places aboard the "Crest". Thus, this Court, as the trier of fact and the judge of the credibility and weight to be accorded the testimony of all

1. "d.b." or decibel is a measure of sound pressure and "a" is the frequency analysis of the sound which considerably filters out the low frequencies and is the analysis that best relates to noise exposure level.

witnesses based upon its observation of them and their expertise and all other factors to be considered in weighing the evidence, must and will herein resolve these disputes.

On May 24, 1977, Dr. Gordon L. Stanfield,[2] employed by the plaintiff and Professor Douglas F. Muster, hired by WGC, each tested or measured noise levels aboard the "Western Crest" at varying r. p. m.'s from substantially the same positions or areas, each using special calibrated instruments. Each of these witnesses recorded different d. b. a.'s or noise levels. This Court finds the evaluations or briefings made by Dr. Stanfield to be the more accurate of the two and thus accepts them as the true measure of the noise levels which existed on that date.

Dr. Stanfield's noise level measurements made at the following positions resulted in a recording of the following d. b. a.'s:
POSITION ONE—Outside shooting shack behind vacuum pumps:

    (a) At 1100 r. p. m.'s with three vacuum pumps running—87 to 91 d. b. a.'s

    (b) At 1500 r. p. m.'s—97 d. b. a.'s

    (c) At 1800 r. p. m.'s—101 d. b. a.'s

POSITION TWO—Inside shooting shack with three vacuum pumps running:

    (a) Door open at 1100 r. p. m.'s—94 d. b. a.'s

    (b) At 1100 r. p. m.'s with air conditioner on and door closed—82 to 83 d. b. a.'s

    (c) Door open at 1800 r. p. m.'s—97 d. b. a.'s

    (d) Door closed with air conditioning on at 1800 r. p. m.'s—84 d. b. a.'s

POSITION THREE—Near gun davit:

    (a) At 1100 r. p. m.'s with electric motor not running—82 d. b. a.'s

    (b) At 1100 r. p. m.'s with motor running during gun operations—85 to 86 d. b. a.'s

In addition, Dr. Stanfield took readings at six other positions all of which are reflected on Exhibit P–33.

Inasmuch as the "Crest" was equipped with generator mufflers at the time that the above measurements were taken, the noise levels aboard the "Beacon", "Reef" and "Gulf" were at least as high as, and probably exceeded the above readings of May 24, 1977 during the entire period of the plaintiff's service aboard those vessels, and inasmuch as they were not equipped with generator mufflers and at times would make seismograph runs or streams in excess of 1100 and up to 1300 r. p. m.'s.

The OSHA standard for permissible exposure to noise is currently set at a maximum level of 90 d. b. a.'s for eight hours during any twenty-four hour period. During the performance of his duties, Mr. Delahoussey was often required by the defendant to be exposed to noise levels in excess of those permissible limits. In any event, the Court finds in accordance with the testimony of Dr. Stanfield and Dr. Pace that the noise levels which existed aboard the "Crest", "Gulf", "Reef" and "Beacon" during the plaintiff's performance of his duties thereon constituted hazards to the safety of his hearing and should have been reasonably anticipated by the defendants and thus guarded against. The defendant, through its safety directors, had accumulated material regarding hearing protection as indicated by correspondence and brochures in their safety files (Exhibits P–10–15); nevertheless, no hearing conservation program or safety requirements had ever been instituted or promulgated by the defendant in any of its safety manuals or bulletins or had ever been discussed in any of its safety meetings, and no ear protection devices had ever been recommended or issued to any of its employees, including the plaintiff, working in the area of the high level noises.

2.  Dr. Stanfield received his Ph.D. from the University of Southern Mississippi and is an Audiologist and Director of the Audiology Clinic at Keesler Air Force Base, Mississippi and the owner and director of the Audiology Speech and Language Clinic at the Coast Medical Center in Biloxi, Mississippi. His qualifications are in evidence as Exhibit P–31. Suffice it to say that his clinic is a diagnostic evaluation clinic for a large number of physicians, primarily ENT specialists, and has performed many sound level surveys for various industries as well as the five southeastern states area for the Keesler Air Force Base clinic.

■ This Court finds that the engine system, shooting shack and operation procedures aboard the defendant's vessels "Crest", "Beacon", "Reef" and "Gulf" were not reasonably fit for their intended purpose and constituted a hazard likely to be incurred by those performing the work performed by the plaintiff. Stated another way, the damaging noise levels were hazards or forces likely to be incurred by gun operators, including the plaintiff, and the defendant, WGC, failed to provide working vessels, fittings and equipment sufficient to withstand those anticipated forces for the following reasons: except for the placing of mufflers on two generators on the "Crest" there were no steps taken by the defendant to reduce the high and hazardous noise levels being emitted from the engine rooms through the stacks on these vessels; the vacuum pumps were not engineered to prevent or diminish noise emission, either direct or structure borne, and were not sufficiently tall enough or positioned so as to prevent excessive engine noise from being transmitted toward and within the shooting shack where plaintiff was required to perform his duties as a seismographic gunner; the position and layout of the shooting shack was such that its proximity and openings subjected the plaintiff to the maximum noise levels being emitted from the engines and generators, and the shack was constructed without any accoustical material but entirely of one-half to three-quarter inch plywood walls, ceilings and floors mounted directly upon the steel deck so that engine noise transmitted into the shack was trapped, reflected and augmented due to vibration of that material, although preconstructed insulated modules were available and could have been procured by the defendant at very little cost, or at least the shooting shacks being utilized by it could have been insulated at nominal cost; there were no instructions or requirements with reference to the door of the shack being closed while occupied and being utilized by the plaintiff and other gun operators; the defendant at no time had conducted any pre-employment or post-employment hearing tests on any of its employees, including its gun operators, to determine whether they were predisposed to injury from excessive noise levels of the type being emitted aboard the vessels in question, or in other words, as several witnesses testified, whether they had "brittle" ears, and also had failed to make or take any noise level measurements aboard the vessels to determine whether it was potentially injurious to employees working in the vicinity, although the defendant was aware of the potential hazard or peril thereof.

Not surprisingly, the expert testimony offered by each side is in diametric conflict concerning the cause of plaintiff's admitted noise-induced hearing loss. The plaintiff contends that the excessive noise level to which he was subjected aboard the defendant's vessels was the cause, and the defendant alleges that the firing of the 105mm howitzers during World War II was the culprit. This Court finds that the direct proximate cause of the plaintiff's severe and permanent bilateral sensory-neural hearing loss was the excessive and hazardous noise levels to which he was exposed while working aboard the defendant's vessels "Crest", "Gulf", "Reef" and "Beacon" during the performance of his duties. Although Mr. Delahoussey was exposed to several months of artillery fire during his military service during World War II he did not at any time notice or complain of any hearing problems during or after that period of service, and he was not subjected to any excessive or hazardous noise levels while serving aboard shrimping vessels for a period of approximately twenty years between the times of his discharge from service and when he first noticed his hearing problem in 1969 or 1970 while employed by the defendant in his capacity as a gunner. Although his problem progressively worsened subsequent to 1970, he was not aware of the extent or seriousness thereof until he sought medical treatment for his dizziness in 1975, during which Dr. Pace discovered that he had suffered the permanent and disabling sensory-neural hearing loss. Both Dr. Pace and Dr. Stanfield were of the opinion that he could not be successfully

treated or his problem alleviated by the use of any hearing aid devices and would become progressively worse, and would lead to eventual total deafness if he continued in his present employment. The plaintiff was suffering from a condition in his left ear known as cochleasclerosis which was unrelated to noise exposure or noise-induced hearing loss, which did result in a more pronounced or severe hearing loss in his left ear than in his right. Although he was susceptible or predisposed to noise-induced hearing loss in the left ear because of the foregoing condition, nevertheless he had suffered no significant hearing loss or problem because of that condition prior to his employment by the defendant.

As a proximate result of excessive and hazardous noise levels to which Mr. Delahoussey was exposed, and pursuant to the advice and recommendation of his doctor, he terminated his employment with defendant on July 31, 1976, although he did not inform his employer of his reason for quitting, which was probably due to the fact that he had only a fifth grade education and was not one of the most intelligent individuals that this Court has observed testify.

Although Mr. Delahoussey still has fair hearing in the lower frequencies, Dr. Wallace Rubin, an eminently well qualified Otolaryngologist, was of the opinion that he has sixty to sixty-five percent hearing in his left ear and eighty percent in his right, or more appropriately and correctly stated, he has sustained a hearing loss of thirty to thirty-two percent in his right ear and thirty-five percent in his left, the excessive loss in the left ear being due to cucleoscrosis. The hearing tests administered by Dr. Stanfield's clinic on November 11, 1976 and July 20, 1977 and the examinations of Doctors Pace and Rubin confirmed the foregoing hearing loss, which is more marked when there is present other or competing accoustical noise, which results in a decrease in the ability to understand and discriminate the spoken word.

As previously stated, plaintiff's noise-induced hearing loss is permanent in nature and was such that he was required to discontinue his work which subjected him to the damaging noise levels, which was the sole or at least major cause of his permanent hearing loss, and which would have resulted in progressive and more severe loss and probable eventual total deafness.

At the time that plaintiff was employed by the defendant in November, 1974 he was in good health and suffered no hearing impairment, and at the time he terminated his employment in July, 1976 he was fifty years of age and at the time of trial was fifty-two years of age and had an average work life expectancy of thirteen years and was making $1200.00 per month. The plaintiff's loss of earning and employment benefits from July 1, 1976, when his employment with the defendant terminated, to July 15, 1978 was as follows: Loss of wages at $1200.00 per month from August 1, 1976 to July 15, 1978—$28,200.00; Value of room and board on the defendant's vessels for twenty days per month from August 1, 1976 to July 15, 1978—$5,640.00; Value of group medical insurance from August 1, 1976 to July 15, 1978—$848.64; Life insurance—$14.00, or a total loss of earning and employment benefits in the amount of $34,702.64 if he had continued to be employed by the defendant during the above period of time. After his employment with the defendant terminated Mr. Delahoussey attempted to operate a restaurant and lounge, in which he failed financially, and then acquired a shrimp boat but was unable to earn any profits in the operation thereof. He finally obtained work through the Mississippi Employment Commission and presently holds a job with the Mississippi Coast Coliseum Commission as a maintenance employee, at which he earns $7,384.00 per year. His earnings from this job which he obtained on August 1, 1976 to July 15, 1978 is $2,359.00, which when deducted from the amount of earnings and employment benefits lost to date because of his required termination of employment with the defendant amounts to $32,343.64.

Dr. Terrell Pike, who has a Ph.D. in Economics with a minor in Management, and

who teaches at the University of Southern Alabama, testified for the plaintiff concerning the present net cash value of future loss of earnings over the plaintiff's work life expectancy of thirteen years, taking into consideration and deducting his present earnings as a security guard at the Mississippi Coast Coliseum Commission. She projected the present value of future loss of wages and employment benefits, excluding any expected increase of profit sharing at the rate of 24.6 percent annually, and also including this projected profit sharing, and used discount rates of four and one-half percent and five and one-half percent, and for each projection considered the plaintiff's wage rate of $1200.00 per month or $14,400.00 per year, the value of room and board at $2,880.00 annually, the value of group medical insurance for the sum of $434.64 annually and the value of life insurance at $7.00 annually. Dr. Pike also projected and deducted Mr. Delahoussey's earnings at the Mississippi Coast Coliseum Commission at the annual rate of $7,384.00, applying the same discount rates.

In determining the net present cash value of future loss of earnings of the plaintiff over his work life expectancy, in accordance with the teachings of *Johnson v. Penrod*, 510 F.2d 234 (5th Cir.) en banc, this Court is of the opinion and finds that the five percent discount rate is appropriate and more realistic, and that the problematical increase of profit sharing at the rate of 24.6 percent annually should not be included. Thus the plaintiff's total yearly earnings loss is $10,337.64, his former total yearly compensation of $17,721.64, less his present yearly earnings of $7,384.00.

In accordance with the testimony of Mr. Carl Savit, Senior Vice-President in charge of Technology and Research Development for the defendant, the Court finds that the defendant has been phasing out its aqua-pulse units during the last two years and will probably complete this phase-out in an additional two to three years. These will be replaced with high pressure air guns which are more sophisticated and highly technical, and accordingly the defendant has been re-training its aqua-pulse opera-

tors such as the plaintiff to use the air guns. The air pressure guns will be phased out in approximately five years and replaced with new computer type equipment, which would require someone with at least a high school education and much re-training to operate. The defendant would attempt to place air pressure gun operators in other positions such as security men and other manual unskilled jobs rather than discharge them, if possible. There was no evidence offered concerning the rate of pay these displaced employees would receive, so the Court feels that it could not with any assurance say that they would receive a higher rate of pay than the plaintiff is receiving at the Mississippi Coast Coliseum Commission.

Therefore, this Court feels that in computing the present net cash value of future loss of earnings of the plaintiff, Mr. Delahoussey, that it must consider his gross earnings per year for a maximum period of eight years in the future, without considering any future profit sharing revenue and discounted by five percent, deducting therefrom what he is earning at the Mississippi Coast Coliseum Commission discounted at the same five percent rate. So computed this amounts to $66,814.30 as future loss of earnings by the plaintiff over the next eight years.

In addition, the plaintiff has sustained reasonable medical expenses for the necessary treatment of his injuries in the sum and amount of $424.00 and is entitled to compensation for impairment of his hearing ability together with attendant past and future mental anguish, suffering and inconvenience in the sum and amount of $7,500.00.

## CONCLUSIONS OF LAW

During the entire period of his employment with the defendant the plaintiff was a seaman and crew member permanently assigned to the motor vessels "Cay", "Geophysical II", "Gulf", "Beacon", "Reef" and "Crest", and as a member of the scientific crew as a gun operator he contributed to

the sole mission of the vessels, that is, obtaining seismographic data in the oil exploration field. *Offshore Co. v. Robison*, 266 F.2d 769, 775 (5th Cir.1959). *Sennett v. Shell Oil Company*, 325 F.Supp. 1, (E.D.La. 1971).

The defendant was under the duty to supply plaintiff with seaworthy vessels on which to perform his duties as a seaman. This it failed to do for the foregoing reasons because of the above discussed hazards, perils and forces likely to be incurred and its failure to provide a vessel and particular fittings sufficient to withstand the forgoing anticipated hazards, perils and forces. Thus the defendant failed to provide the plaintiff with seaworthy vessels upon which to perform his duties. *Marshall v. Ove Skou Rederi A/S*, 378 F.2d 193 (5th Cir.1964), *cert. denied* 389 U.S. 828, 88 S.Ct. 86, 19 L.Ed.2d 84.

■ The above unseaworthiness of the vessels of the defendant was the sole proximate cause of the plaintiff's noise-induced hearing loss and all of the above damages directly resulting therefrom. The hearing loss constitutes an "injury". *Travelers Insurance Co. v. Cardillo*, 225 F.2d 137 (2d Cir.1955); *Monti Marie Corp. v. Quigley*, 167 F.Supp. 690 (E.D.N.Y.1958). Predisposition to the noise-induced hearing loss of the plaintiff does not insulate the defendant from liability. *Fair v. Mississippi Valley Barge Line*, 239 F.Supp. 158 (S.D.Tex. 1965).

Based upon the foregoing Findings of Fact and Conclusions of Law, the plaintiff, Leo Delahoussey, is entitled to a judgment against the defendants in the sum and amount of $107,081.94, actual and compensatory damages together with all taxable costs of this proceeding, but no punitive damages.

· A judgment conforming with the foregoing Findings of Fact and Conclusions of Law approved as to form shall be presented to this Court within the time and in the manner prescribed by the local rules of this Court.