Libby Marie SENNETT, acting in her own behalf and as personal representative of the Estate of Albert L. Sennett, Plaintiff,

v.

SHELL OIL COMPANY, Defendant.

Civ. A. No. 70–1624.

United States District Court,
E. D. Louisiana,
New Orleans Division.

Feb. 25, 1971.

Harris M. Dulitz, John R. Martzell, Leo Unger, New Orleans, La., for plaintiff.

Al J. Moore, New Orleans, La., for defendant.

RUBIN, District Judge:

A motion to dismiss or for summary judgment raises, apparently for the first time, the interpretation to be given the Oceanographic Research Vessels Law, 46 U.S.C. Sec. 441 et seq., adopted by Congress in 1965. The issue arises as a result of the death of Albert L. Sennett, an employee of Shell Oil Company, aboard

Shell's vessel, the R/V NIOBE, off the Coast of Nova Scotia, on May 12, 1970. Mr. Sennett was working aboard the R/V NIOBE when, it is alleged, a defective seismic air gun fired improperly and blew off the right side of his head.

His widow and children filed suit against Shell under the provisions of the Jones Act, 46 U.S.C. § 688, the Death on the High Seas Act, 46 U.S.C. § 761 et seq., General Maritime Law and Article 2315 of the Louisiana Civil Code. Shell contends that the sole remedy of the survivors is under the Louisiana Workmen's Compensation law because the decedent was hired in Louisiana, and that all other remedies are foreclosed by the Oceanographic Research Law. It would be a strange result if one who labors on the high seas may recover against his employer only under state compensation laws for an industrial accident. So we examine the statute to determine whether this is the result that Congress ordained.

## I. PURPOSE AND PROVISIONS OF THE LAW

Vessels engaged in oceanographic research are operated by a crew that performs the duties usually assigned to seamen. These vessels also carry a complement of scientific personnel who are engaged in research and have nothing to do with the navigation or maintenance of the vessel. However, prior to 1965, some scientific personnel might be considered members of the crew because they contributed to the mission of the vessel even though their duties were scientific in nature. Those scientific personnel who could not be considered crewmen were classified as passengers under the general laws relative to passenger vessels.

Congress found that these requirements hampered the operation of such research vessels. The purpose of the Oceanographic Research Law, as reflected in the Senate Committee Report [The Report], was "to encourage and facilitate oceanographic research by removing certain impediments which have been hampering the operation of research vessels, and particularly the large, new, modern scientific ships which have been and are being made available under the expanded national oceanographic program." Senate Rep. No. 1276, 88th Cong., 2d Sess. 1.

The statute defines an "oceanographic research vessel" [O.R.V.] as a "vessel which the Secretary of the department in which the Coast Guard is operating finds is being employed exclusively in instruction in oceanography or limnology, or both, or exclusively in oceanographic research, including, but not limited to, such studies pertaining to the sea as seismic, gravity meter and magnetic exploration and other marine geophysical or geological surveys, atmospheric research, and biological research." 46 U.S.C. Sec. 441. The Secretary of Transportation, the department in which the Coast Guard is now operating has found the law applicable to vessels meeting the description of the R/V NIOBE. 46 CFR § 188.05-1.

O.R.V. classification bestows unique legal characteristics on the ship:

(1) It is not considered a passenger vessel under the laws relative to the inspection and manning of merchant vessels by reason of the carriage of scientific personnel. 46 U.S.C. Sec. 442.

(2) It is not deemed to be engaged in trade or commerce. 46 U.S.C. Sec. 443.

(3) Scientific personnel aboard her "shall not be considered seamen under the provisions of title 53 of of the Revised Statutes and Act (sic) amendatory thereof or supplementary thereto."

(4) If the Secretary determines that application to it of any provision in Title 52 or Title 53 of the Revised Statutes, or Acts amendatory thereof, is not necessary in the performance of the mission of the vessel, he may by regulation exempt any such vessel from such provision, upon such terms and

conditions as he may specify." 46 U.S.C. Sec. 445.

The purpose, then, of this statute is to classify scientific personnel aboard O.R.V.'s as nonpassengers to remove O.R.V.'s from some of the existing statutory regulations pertaining to passenger vessels; to classify scientific personnel—but scientific personnel only—aboard O.R.V.'s as non-seamen so as to relieve O.R.V.'s of the obligation of complying with certain statutory regulations pertaining to seamen; and to give the Secretary of Transportation authority to exempt the vessel from existing statutes and adopt new regulations more appropriate to an O.R.V. The statute does not remove O.R.V.'s from classification as vessels. It does not, with respect to either their traditional maritime crew or their scientific personnel, change the provisions of general maritime law. It does not provide any compensation scheme with respect to industrial accidents to scientific personnel although Congress clearly had power to do so. And it neither says nor implies that scientific personnel shall have the protection of the statutes of each of the fifty states depending on the happenstance of where each made his contract of employment.

It must be concluded then that the statute does not by alchemy transmute vessels into non-vessels, nor does it convert scientific personnel into a new category of workers at sea to whom the vessel owes no duty. With respect to all other matters than those dealt with by the statute, O.R.V.'s remain vessels; general maritime law applies to them and to all aboard them, including scientific personnel; and the owner, the master, and the crew of the vessel are not relieved of all obligation to those scientific personnel whose tasks furnish the sole raison d'etre for the O.R.V.

## II. APPLICABILITY OF THE LAW TO THE R/V NIOBE

It is suggested that the bill was designed to apply only to vessels operated in the public interest, but an early draft containing such a provision was amended to delete this limitation, in order "to encourage industry as well as academic participation in the oceanographic effort." The Report at p. 2.

This purpose is further evidenced by House Report No. 599, 1965 U.S.Code Cong. and Ad. News, page 2385, which states:

"However, the Coast Guard witness testified that the term 'public interest' would be construed as limiting the oceanographic research vessel definition to vessels being operated by scientific institutions, the Government, or under contract with the Government. Inasmuch as industry is becoming increasingly engaged in scientific research in connection with the ultimate exploitation of ocean resources, your committee felt that it was inconsistent and unreasonable to so limit the oceanographic research exemption. Accordingly, it was determined that the definition should be amended so as to clearly indicate the intention of Congress to treat all vessels engaged in oceanographic research on the same basis."

The statute itself indicates that commercial vessels are included in its coverage, else it would not be necessary for it to state that classified vessels are not deemed to be engaged in trade or commerce. 46 U.S.C. § 443. In addition the Regulations, Table 7, 46 CFR § 188.05–1 classify all vessels engaged in oceanographic research as subject to the law without limiting its application to non-commercial vessels.

The R/V NIOBE was owned by Shell Oil Company and was engaged in an effort to find oil and gas. While this was for Shell's profit, the vessel was engaged solely in oceanographic research. Hence it is subject to the provisions of the law.

## III. WAS SENNETT A SEAMAN?

The classification of a maritime worker as a seaman has two consequences. It makes him eligible for the benefits

granted seamen by general maritime law, principally maintenance and cure in the event of disability in the service of his vessel and the warranty of seaworthiness of the vessel on which he is engaged. In addition, a seaman has the protection of the Jones Act with the right to claim damages for injury or death resulting from the negligence of his employer; for this purpose he may demand a trial by jury or he may elect to pursue the claim in admiralty without a jury trial. The remedies at general maritime law and under the Jones Act are separate, and they may be sought in separate suits or joined in a single action.

Shell contends that the O.R.V. law prevents Sennett from being considered a seaman under either the Jones Act or general maritime law. The plaintiffs contend he was a seaman for purposes of both.

■■ Before determining the legal consequences of his classification as a seaman, we look first to the legal requirements for seaman's status and apply them to Sennett's duties to determine whether Shell is entitled to a summary judgment on the question of his status. To establish that a maritime worker was a seaman, it must be shown that he was employed aboard a vessel in navigation, that he had a more or less permanent connection with the vessel, and that he was aboard primarily to aid in navigation. Bodden v. Coordinated Caribbean Transport, Inc., 5 Cir. 1966, 369 F.2d 273, 274.[1] Only the third requirement is at issue here.

It was long ago established that seaman's status is not limited to the traditional blue water sailor. It is "not confined to those who 'hand, reef and steer' but [is] applicable 'to all whose duties contribute to the operation and welfare of the vessel' ". Offshore Co. v. Robison, 5 Cir. 1959, 266 F.2d 769, 775.

■ In *Robison* the court discussed at some length the cases that have expanded the number of those who are considered to "aid in navigation." The claimants, in those cases:

[A]re not ordinarily thought of as 'seamen' aboard 'primarily in aid of navigation', although they may serve the vessel in the sense that the work they perform fits in with the function the vessel serves. * * * They had absolutely nothing to do with navigation, as such, nothing to do with the operations or welfare of a vessel in the sense that a vessel is a means of transport by water, and were not members of a ship's company in the sense that ship's cook or carpenter are necessary or appropriate members of a ship's complement. But in the light of the function or mission of the special structure to which they were attached, they served in a capacity that contributed to the accomplishment of its mission in the same way that a surgeon serves as a member of the crew of a floating hospital.

Thus, if there is proof that "the capacity in which [the deceased] was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel * * * *" there is a fact issue concerning whether he was a seaman.

Affidavits introduced by the parties indicate that, at the time of the accident, the R/V NIOBE was on a research mission gathering seismic and geological information from the ocean floor off the Atlantic Coast of Canada for Shell Oil Company of Canada. The scientific personnel consisted of an "instrument group" which maintained and operated the computers and other instruments recording the research information, a "shooting group" which maintained and

---

1. Such proof would establish that the deceased was a "traditional seaman." It is unnecessary to consider cases in the *Sieracki* line, which deal with "assimiliated seamen," those who become entitled to the warranty of seaworthiness because they do seamen's work even though they lack any permanent connection with the vessel. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 1946, 66 S.Ct. 872, 90 L. Ed. 1099.

operated the sources of energy for sounding the ocean floor and some surveyors. Albert Sennett worked primarily with the instrument group, reading, maintaining and operating the computers and other instruments that recorded the research information. In addition, Sennett assisted in loading supplies aboard the R/V NIOBE, maintained the stern of the vessel and his living quarters and painted equipment.

It is a question of fact, not determinable on motion for summary judgment, whether Sennett's scientific duties "contributed to the function of the vessel or the accomplishment of its mission," like the contribution made by the "surgeon crew member of a floating hospital." In addition, although it appears clear beyond dispute that he was employed solely to perform scientific duties, there may be a factual issue concerning whether he was later assigned any non-scientific duties that made him a seaman. Thus whether Sennett was a seaman is still in dispute and summary judgment on this issue may not be granted.

### IV. THE O.R.V. LAW AND SEAMAN'S STATUS

The O.R.V. Law does not in terms remove scientific personnel from seaman's status under either general maritime law or the Jones Act. It provides merely that they are not considered seamen under Title 53 of the Revised Statutes "and Act (sic) amendatory thereof or supplementary thereto." Clearly this neither states nor implies that O.R.V. scientific personnel are not seamen for any purpose. Hence they retain seaman's status under general maritime law.

It is urged that, because the Jones Act is neither a part of Title 53 nor is expressly mentioned in the O.R.V. Law it should be considered to remain fully applicable to O.R.V.'s. But this conclusion does not necessarily follow.

The Jones Act was never a part of the Revised Statutes because it was adopted after they were compiled. Nor is it expressly referred to in the explanatory notes to the Oceanographic Research Law in U.S.C.A.

However, Title 53 of the Revised Statutes of 1878 bears the heading "Merchant Seamen" and was comprised of Sections 4501 through 4612. All of its extant provisions now appear in Title 46 of the United States Code (see Page 73 of the Tables volume of the United States Code Annotated). The Jones Act, which also deals with merchant seamen, is found in this same title (46 U.S.C.A. § 688). At least one part of the Jones Act, Section 31, amended a provision of Title 53 of the Revised Statutes, Section 4530.

It is plain both from its specific provisions and its overall purpose that the Jones Act amends or supplements Title 53 and would have been a part of that Title had it been enacted prior to 1878.

■■■ For these reasons the Jones Act must be considered an act "amendatory" to Title 53 of the Revised Statutes; the Regulations confirm its inapplicability to scientific personnel aboard O.R.V.'s, 46 CFR 188.05–1, and it must be considered that such personnel can no longer avail themselves of this act.

The affidavits and depositions filed make it clear that Sennett was aboard the R/V NIOBE for the purpose solely of engaging in scientific research. He may incidentally have done other things but these were not the purpose of his engagement or his presence aboard ship. Accordingly he must be classified as "scientific personnel."

Hence, to the extent the complaint seeks relief under the Jones Act, the motion for summary judgment must be granted.

### V. THE O.R.V. LAW AND THE DEATH ON THE HIGH SEAS ACT

Seamen claiming a breach of the warranty of seaworthiness may sue under the Death on the High Seas Act. See Kernan v. American Dredging Co., 1958, 355 U.S. 426, 78 S.Ct. 394, 397 n. 4, 2 L. Ed.2d 382; Symonette Shipyard Ltd. v. Clark, 5 Cir. 1966, 365 F.2d 464, cert.

denied 387 U.S. 908, 87 S.Ct. 1690, 18 L. Ed.2d 625; Doyle v. Albatross Tanker, S.D.N.Y.1965, 260 F.Supp. 303, aff'd 2 Cir., 367 F.2d 465 and cases cited therein. But for the reasons discussed in the preceding section, the Death on the High Seas Act, like the Jones Act, must be considered an act amendatory of Title 53. Hence Sennett's survivors' right to recover under the Death Act is precluded by the O.R.V. law. Thus, to the extent the complaint seeks relief under the Death on the High Seas Act, the motion for summary judgment must be granted.

## VI. THE GENERAL MARITIME LAW

In Moragne v. States Marine Lines, 1970, 398 U.S. 375, 90 S.Ct. 1772, 26 L. Ed.2d 339, the Supreme Court overruled The Harrisburg, 119 U.S. 199, 71 S.Ct. 140, 30 L.Ed.2d 358, and found a right to recover for wrongful death in the general maritime law. Though *Moragne* dealt with the problem of death in coastal waters, which was uniquely complex, nothing in the opinion suggests that the maritime right is to be denied those whose death is brought about wrongfully on the High Seas. As *Moragne* pointed out, the policy implicit in the state and federal wrongful death statutes indicates that recovery for maritime death should be permitted absent "a legislative direction to except a particular class of cases." 90 S.Ct. at 1783.

 Congress has not so directed. The Death on the High Seas Act is not an exclusive remedy for those whose relatives perish wrongfully one marine league from shore. In *Moragne* the Supreme Court was presented with three anomalies of the prior law that could be ameliorated by the overruling of *The Harrisburg*. One, "assertedly the strangest", was that:

a true seaman—that is, a member of ship's company, covered by the Jones Act—is provided no remedy for death caused by unseaworthiness within territorial waters, while a longshoreman, to whom the duty of seaworthiness was extended only because he performs work traditionally done by seamen, does have such a remedy when allowed by a state statute.[12]

In the footnote indicated in the text, the court elaborated on the paradox.

A joint contributor to this last situation, in conjunction with the rule of The Harrisburg, is the decision in Gillespie v. United States Steel Corp., 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964), where the Court held that the Jones Act, by providing a claim for wrongful death based on negligence, precludes any state remedy for wrongful death of a seaman in territorial waters—whether based on negligence or unseaworthiness. The Court's ruling in *Gillespie* was only that the Jones Act, which was "intended to bring about the uniformity in the exercise of admiralty jurisdiction required by the Constitution, * * * necessarily supersedes the application of the death statutes of the several States." *Id.*, at 155, 85 S.Ct., at 155. The ruling thus does not disturb the seaman's rights under general maritime law, existing alongside his Jones Act claim, to sue his employer for injuries caused by unseaworthiness, see McAllister v. Magnolia Petroleum Co., 357 U.S. 221, 78 S.Ct. 1201, 2 L.Ed.2d 1272 (1958), or for death on the high seas caused by unseaworthiness, see Kernan v. American Dredging Co., 355 U.S. 426, 430, n. 4, 78 S.Ct. 394, 397, 2 L.Ed.2d 382 (1958); Doyle v. Albatross Tanker Corp., 367 F.2d 465 (C.A.2d Cir. 1966); cf. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953). Likewise, the remedy under general maritime law that will be made available by our overruling today of *The Harrisburg* seems to be beyond the preclusive effect of the Jones Act as interpreted in *Gillespie*. The existence of a maritime remedy for deaths of seamen in territorial waters will further, rather than hinder, "uniformity in the exercise of admiralty jurisdiction"; and, of course no question of preclusion of a *federal* remedy was before the Court in *Gilles-*

*pie* or its predecessor, Lindgren v. United States, 281 U.S. 38, 50 S.Ct. 207, 74 L.Ed. 686 (1930), since no such remedy was thought to exist at the time those cases were decided. See G. Gilmore & C. Black, *supra*, at 304; but cf. Kernan v. American Dredging Co., 355 U.S., at 429–430, 78 S.Ct. at 397.

As with the Jones Act, the Congressional provision of statutory relief for death on the high seas does not foreclose judicial allowance of a remedy for such death. Should there be a conflict between schedule of beneficiaries or the recoverable items of damage under the *Moragne* right and the Death Act, there is no need to consider here which would control. For there is no showing of conflict in this case. See Dennis v. Central Gulf Steamship, E.D.La.1971, 323 F.Supp. 943. The O.R.V. law does not affect the general maritime right to recover. Hence to the extent the complaint seeks relief under the general maritime law, the motion for summary judgment is denied.

## VII. RECOVERY UNDER ARTICLE 2315

 Under the rule of The Tungus v. Shovgaard, 1959, 358 U.S. 588, 79 S. Ct. 503, 3 L.Ed.2d 524, Article 2315 would have applied had Sennett died in Louisiana territorial waters. But The Tungus has now been superceded by the decision in Moragne v. States Marine Lines, 1970, 398 U.S. 375, 90 S.Ct. 1772, 1776, 26 L.Ed.2d 339. See, also, Dennis v. Central Gulf Steamship Corp., E.D.La. 1971, 323 F.Supp. 943. In addition, Sennett died off the coast of Nova Scotia. Hence, insofar as the complaint seeks relief under Article 2315, the motion for summary judgment is granted.

## VIII. RECOVERY FOR NEGLIGENCE

 The trier of fact must determine if Sennett was a seaman. If he was, there can be no recovery for ordinary negligence "under the peculiar maritime doctrine of *The Osceola*," *Moragne,* 90 S.Ct. at 1787. In *The Osceola,* 1903, 189 U.S. 158, 23 S.Ct. 483, 487, 47 L.Ed. 760, the court held,

"Upon a full review, however, of English and American authorities * * we think the law may be considered as settled upon the following propositions * * * 4. That the seaman is not allowed to recover an indemnity for the negligence of the master, or any member of the crew * * *."

If, however, Sennett was not a seaman, then Shell owed him a duty of reasonable care. "It is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." Kermarec v. Compagnie Generale Transatlantique, 1958, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed. 2d 550. That the O.R.V. act does not remove all federal sanctions for negligence or violation of safety rules is evident also from the regulations insofar as they deal with operators. 46 CFR § 196.03–1, (b) adopted pursuant to the O.R.V. Law, provides,

" * * * [A]ny licensed or certificated personnel committing an act of misbehavior, negligence, unskillfulness, endangering life, violation of marine safety statutes or regulations or requirements thereunder, and incompetency shall be subject to proceedings within the provisions of 46 U.S.C. 239 * * * with respect to suspension or revocation of license or certificate."

This, and the companion provision, 46 CFR § 196.03–1(a) implies continued liability for the fault of those responsible for operation of the vessel notwithstanding enactment of the O.R.V. Law. Nor does the law relieve the "master or officer in command from the consequences of any neglect to keep a proper lookout or the neglect of any precaution which may be required by the ordinary practice of seamen or by the special circumstances of the case," 46 CFR § 196.27–1, or from responsibility for operating the vessel in a reckless or negligent manner. 46 CFR § 196.27–10.

Sennett, like any one else lawfully aboard the vessel, was entitled to have Shell exercise due care to provide him with a safe place to carry out the purpose of his business.

Therefore, insofar as the complaint seeks relief under the general maritime law for negligence, the motion for summary judgment is denied.

The motion to dismiss is likewise denied.