James R. PRESLEY, Plaintiff,

v.

The vessel CARRIBEAN SEAL, etc., in rem, and Caribe Company, Seal Fleet, Inc., Geophysical Service, Inc., and Sealcraft Operators, Inc., Defendants.

Civ. A. No. G–81–56.

United States District Court, S. D. Texas, Galveston Division.

April 26, 1982.

William R. Edwards, Edwards & Perry, Corpus Christi, Tex., for plaintiff.

Eugene J. Silva, Vinson & Elkins, Houston, Tex., for defendants.

## MEMORANDUM AND ORDER

HUGH GIBSON, District Judge.

The plaintiff, James R. Presley, commenced this action under the Jones Act, 46 U.S.C. § 688, and general maritime law against his employer, Geophysical Service, Inc., the M/V CARRIBEAN SEAL, and her owners, Caribe Company and Sealcraft Operators, Inc., for injuries allegedly sustained in the course and scope of his employment on board the vessel. Geophysical Service, Inc., has moved for summary judgment, asserting that the plaintiff's claims against it under the Jones Act and general maritime law are precluded by the Oceanographic Research Vessels Act (ORVA), 46 U.S.C. § 441 *et seq.*

In issue here is section 4 of the ORVA, 46 U.S.C. § 444, which provides that scientific personnel on oceanographic research vessels shall not be considered seamen under the provisions of Title 53 of the Revised Statutes and acts amendatory or supplementary thereto. While the Act does not expressly encompass the Jones Act or general maritime law, defendant argues that its language and legislative history evidence congressional intent to exclude scientific personnel from the class of persons entitled, under the Jones Act and general maritime law, to maintain an action for damages for personal injury brought about by the negligence of the employer or the unseaworthiness of a vessel.[1] Plaintiff, to the contrary, argues from the legislative history of the

---

1. A general maritime seaman also has a right to maintenance and cure and may bring an action for its recovery. *See generally* G. Gilmore & C. Black, The Law of Admiralty §§ 6–6 to 6–13 (2d ed. 1975). If section 4 of the ORVA denies plaintiff seaman status under general maritime law, this remedy of course is foreclosed to him.

Act that Congress could not have intended such a result. The Court agrees.

## I. *The ORVA: Background and Legislative History*

In enacting the Oceanographic Research Vessels Act in 1965, Congress recognized that oceanographic research vessels, and personnel aboard them engaged in specialized scientific work in the marine sciences, required differing treatment under regulatory and safety laws than did other vessels and their personnel engaged in the usual pursuits of commercial passenger and cargo carrying. H.R.Rep.No.599, 89 Cong., 1st Sess., *reprinted in* [1965] U.S.Code Cong. & Ad.News, 2383, 2384. *See* S.Rep.No.1276, 88 Cong. 2d Sess. 1. The objective of the legislation was to exempt research vessels from the strict inspection and personnel protection laws mandated for commercial crews which hindered the mission of technical or scientific personnel. *South Corp. v. United States*, 531 F.Supp. 180, 185 (C.I.T. 1982).

The classification of scientific personnel under existing laws and regulations administered by the United States Coast Guard [2] was a major legislative concern. H.R.Rep. No.599, *supra*; Oceanographic Research Vessels Exemption: Hearings before the Subcommittee on Oceanography of the Committee on Merchant Marine and Fisheries on H.R. 3419 and H.R. 7320, 89 Cong., 1st Sess. 1 (May 4–5, 1965). Research vessels were generally subject to statutory provisions as passenger or cargo vessels, depending on the number and type of personnel carried. In either case, the vessels and their personnel were subject to certain laws relating to vessel inspection, manning, and licensing. For these purposes, the complement of scientific personnel on board the vessels were required to be designated either as passengers or crew members.

Unless scientific personnel were designated as "crew members" or "seamen," the vessels as a practical matter were limited in the number of such personnel that might be carried in order to remain within the statutory category of "cargo or miscellaneous" vessels rather than "passenger" vessels, which were subject to more rigorous regulation than cargo vessels. Classifying scientific or technical personnel as seamen, however, subjected them to statutes involving attainment of merchant mariners' documents and other regulations ill-suited to their function. Oceanographic Research Vessels Hearings, *supra*, at 11–12 (statement of Commander Benkert, U. S. Coast Guard) & 49 (position paper of the Research Vessel Operator's Council).[3]

---

2. The bulk of these regulations have been promulgated pursuant to Title 53 and amending or supplemental legislation and concern certification of seamen, the signing of shipping articles, vessel accommodations, seamen's wages, manning and watch requirements, etc. *See generally* 46 U.S.C. § 541 *et seq.*; 46 C.F.R. §§ 12.01 *et seq.* & 14.01 *et seq.* (1981).

3. The position paper of the Research Vessel Operator's Council, a chief proponent of the legislation, outlined its specific concerns with the classification of scientific personnel:

These three areas have been of concern to the members of the RVOC: (a) Manning and licensing of personnel; (b) inspection of vessels; and (c) identification of the vessels. They are discussed briefly below.
(a) Manning and licensing
As a practical matter the personnel carried onboard research vessels fit into two categories: the operating crew and the scientific personnel. The operating crew consists of the deck, engine, and stewards departments. Scientific personnel consist of the scientists, technicians, and students engaged in the primary mission of the vessel and whose presence is the sole purpose for the vessel's operations.
1. *Operating crew*—On inspected research vessels the operating crewmembers are identified by the possession of a merchant mariner's document which sets forth the holder's personal description and, by endorsement, certifies the particular skilled positions in which he is qualified to serve.
2. *Scientific personnel*—Under existing law the Coast Guard may issue merchant mariner's documents (MMD) to scientists who are citizens of the United States. Such issuance is a time-consuming and costly process, normally requiring upward of 30 days from date of application therefor. In obtaining MMD's the only ratings for which scientific personnel are able to apply are the unqualified entry ratings of ordinary seaman, wipe, or messman. The propriety of thus identifying scientific personnel is questionable, especially with the fluctuating numbers involved.

The ORVA sought to clarify the status of scientific personnel to permit oceanographic research vessels to operate unimpeded by artificial limitations as to the number of scientific personnel carried or the requirements of laws pertaining to seamen that were not geared to the duties of onboard scientists. After defining the terms "oceanographic research vessel" and "scientific personnel" in section 1 of the Act,[4] Congress in section 2 excluded oceanographic research vessels from the category of passenger vessels under the provisions of the laws relating to the inspection and manning of merchant vessels, thereby insuring that scientific personnel on board would not be considered passengers.[5]

Congress, however, did not exempt oceanographic research vessels from the laws applicable to "merchant" or "cargo and miscellaneous" vessels. *United States v. Blue Water Marine Industries, Inc.*, 661 F.2d 793, 794–95 (9th Cir. 1981). *See* Oceanographic Research Vessels Hearings, *supra*, at 15; H.R.Rep.No.599, *supra* (Departmental Reports—Departments of the Interior and the Navy).[6] Oceanographic research vessels thus remained subject to Titles 52 and 53 of the Revised Statutes, and scientific personnel, "seamen" within the meaning of the statute defining the term in Title 53, *see* 46 U.S.C. § 713,[7] remained subject to the regulations pertaining to seamen.

3. *General*—Fruitful discussions on these matters have taken place with the Coast Guard and where authority exists, the problems are being satisfactorily resolved.

The subject bill will enable resolutions of problems regarding the status of the vessels and of the scientific crew onboard.
Oceanographic Research Vessels Hearings, *supra*, at 49.

**4.** 46 U.S.C. § 441. That section provides:

As used in sections 441–445 of this title—
(1) the term "oceanographic research vessel" means a vessel which the Secretary of the department in which the Coast Guard is operating finds is being employed exclusively in instruction in oceanography or limnology, or both, or exclusively in oceanographic research, including, but not limited to, such studies pertaining to the sea as seismic, gravity meter and magnetic exploration and other marine geophysical or geological surveys, atmospheric research, and biological research;
(2) the term "scientific personnel" means persons who are aboard a vessel solely for the purpose of engaging in scientific research, instructing, or receiving instruction, in oceanography or limnology.

**5.** *Id.* § 442. That section provides:

An oceanographic research vessel shall not be considered a passenger vessel, a vessel carrying passengers, or a passenger-carrying vessel under the provisions of the laws relating to the inspection and manning of merchant vessels by reason of the carriage of scientific personnel.
Under applicable regulations a vessel carrying more than 12 passengers would be classified as a passenger vessel. *See* 46 C.F.R. § 90.05–1 (1981).

**6.** In section 3 of the Act, 46 U.S.C. § 443, Congress provided: "An oceanographic research vessel shall not be deemed to be en-

gaged in trade or commerce." In *Blue Water Marine*, however, the Ninth Circuit rejected the argument that section 3 excluded research vessels from the category of "merchant" vessels, citing interpretive Coast Guard regulations and observing that such a construction would render the provisions of section 5, 46 U.S.C. § 445, largely surplusage. 661 F.2d at 795. That section empowers the Coast Guard to exempt research vessels from provisions of Titles 52 and 53 determined to be unnecessary to the performance of the vessel.

It should be noted that research vessels are no longer classified as "cargo or miscellaneous" vessels under the regulations, the Coast Guard having promulgated specific provisions pursuant to Title 52 applicable to research vessels. 46 C.F.R. § 188.01 *et seq.* (1981). The vessels remain fully subject to Title 52, however, except as otherwise provided in accordance with 46 U.S.C. § 445. *See* 46 C.F.R. § 188.05–2(a).

The vessels also remain subject to Title 53, which applies to all vessels not specifically exempted by an act of Congress. Act of Dec. 21, 1898, ch. 28, § 26, 30 Stat. 764. Congress has exempted certain special purpose vessels from the provisions of Title 53, fishing vessels being a prominent example. *See id.*

**7.** Originally enacted as section 4612 of the Revised Statutes. Act of June 7, 1872, ch. 322, § 65, 17 Stat. 277. 46 U.S.C. § 713 provides:

In the construction of title 53 of the Revised Statutes, every person having the command of any vessel belonging to any citizen of the United States shall be deemed to be the "master" thereof; and every person (apprentices excepted) who shall be employed or engaged to serve in any capacity on board the same shall be deemed and taken to be a "seaman"; and the term "vessel" shall be understood to comprehend every description

Congress adopted section 4 of the Act[8] to ensure ·that scientific personnel employed upon research vessels would not be considered as seamen or members of a vessel's operating crew for such purposes. That much is clear from the legislative history of the Act, and from the Coast Guard regulations promulgated thereunder. *See* 46 C.F.R. § 188.05–33 (1981).[9] Whether Congress also envisioned the exclusion of scientific personnel from consideration as seamen for purposes of the Jones Act and general maritime law is less clear.[10] Several courts have held that the reference in section 4 to acts "amendatory" or "supplementary" to Title 53 must be deemed inclu-

sive of the Jones Act. *Castro v. M/V LAFAYETTE*, No. 76–H–755 (S.D. Tx, March 2, 1978) (unpublished opinion); *Sennett v. Shell Oil Co.*, 325 F.Supp. 1 (E.D.La.1971). If the Act, however, is to be interpreted in view of "the mischief to be corrected and the end to be attained," *Warner v. Goltra*, 293 U.S. 155, 158, 55 S.Ct. 46, 48, 79 L.Ed. 254 (1934), it is the opinion of this Court, for the reasons stated herein, that a narrower construction of the statute is required.

## II. *Scientific Personnel, The Jones Act, and General Maritime Law*

■ Although the ORVA has been law for nearly two decades, only a handful of

---

of vessel navigating on any sea or channel, lake or river, to which the provision of such title may be applicable, and the term "owner" shall be taken and understood to comprehend all the several persons, if more than one, to whom the vessel shall belong.

**8.** 46 U.S.C. § 444. That section provides:
Scientific personnel on an oceanographic research vessel shall not be considered seamen under the provisions of title 53 of the Revised Statutes and Act amendatory thereof or supplementary thereto.

**9.** The regulations provide:
(a) Scientific personnel on oceanographic vessels are not considered to be seamen or passengers, but are considered as "persons" when requirements are based on total persons on board.
(b) Scientific personnel on such vessels shall not be required to possess seamen's documents nor shall they be required to sign shipping articles.

**10.** It is an almost unavoidable conclusion from the legislative history of the act that the primary, if not sole, concern of the bill's sponsors and proponents was the web of Coast Guard regulations applicable to scientific personnel *qua* seamen under Title 53. The House Report voiced concern over the application of vessel inspection, manning, and other safety requirements intended for vessels and personnel engaged in normal commercial operations. H.R. Rep.No.599, *supra*; [1965] U.S.Code Cong. & Ad.News at 2383. The Research Vessels Operator's Council, which logically would seem to have been the group most concerned with liability under the Jones Act and general maritime law, expressed dissatisfaction only with licensing and manning provisions. Refer to note 3 *supra*. Jonathan Leiby, Chairman of the Council, cited "overly restrictive regulations" as the impetus for legislation. Oceanographic Research Vessels Hearings, *supra*, at 45.

In fact, there is a conspicuous absence in the legislative history of any discussion as to the possible effect of section 4 on the rights of scientific personnel under the Jones Act or general maritime law. Nowhere is there any indication that Congress viewed the treatment of scientific personnel as seamen under these laws as "the mischief to be corrected" by the proposed legislation, despite repeated emphasis in the testimony before the House Subcommittee that such personnel, while not generally part of the operating crew, were vitally concerned with the primary mission of the vessel. *E.g., id.* at 37 (statement of Dr. Leland J. Haworth, Director, National Science Foundation) & 49 (position paper of the Research Vessels Operator's Council). *See also Sennett v. Shell Oil Co.*, 325 F.Supp. 1, 4 (E.D.La.1971). In the course of that testimony, analogies were drawn on several occasions between scientists on research vessels and fishermen on fishing vessels, who because the vessels on which they worked were exempted from Title 53, would not be considered seamen in the construction of that title. *See* 46 U.S.C. § 713.

It can scarcely be countenanced that Congress, in view of the existing law in 1965, was not aware that shipboard personnel who contributed to the primary mission of a vessel would likely be seamen under the Jones Act and general maritime law, *see Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir. 1959), just as fishermen, although denied seaman status under Title 53 by statutory fiat, clearly may retain that status for purposes of the Jones Act and general maritime law. In this light, congressional exclusion of scientific personnel from consideration as seamen "under title 53 of the Revised Statutes and Act amendatory thereof or supplemental thereto" in section 4 of the ORVA does not appear to have been intended to affect their status under the Jones Act or general maritime law.

district courts have considered the issue before this Court today. The Court is aware of two cases, both holding that the ORVA precludes scientific personnel from maintaining damage actions under the Jones Act. *Castro v. M/V LAFAYETTE, supra; Sennett v. Shell Oil Co., supra. See also Delahoussey v. Western Geophysical Co. of America,* 476 F.Supp. 54 (S.D.Miss.1979) (considering effect of ORVA on general maritime law).[11]

The leading case is *Sennett v. Shell Oil Company.* In *Sennett,* Judge Alvin B. Rubin, then a district court judge for the Eastern District of Louisiana, held that the ORVA did not affect the status of scientific personnel as seamen under general maritime law. The court, however, concluded that the reference in section 4 of the Act to "Title 53 of the Revised Statutes and Act amendatory thereof or supplementary thereto" was sufficiently broad to encompass the Jones Act and foreclose its remedy to scientific personnel aboard oceanographic research vessels.

After examining the purpose and provisions of the Act, the *Sennett* court concluded that scientific personnel had been classified as non-seamen under Title 53 so as to relieve research vessels from the requirements of certain statutory regulations pertaining to seamen that Congress found hampered their oceanographic research mission. The court did not interpret the statute, which neither states nor implies that scientific personnel are not seamen for any purpose, as changing the provisions of general maritime law with respect to either the traditional maritime crew or the scientific personnel on board research vessels. The Act provided only that such personnel would not be considered seamen under Title 53 and amendatory acts. 325 F.Supp. at 4, 6.

The district court also noted that the Jones Act was not enacted as part of Title 53 of the Revised Statutes. However, the court concluded as a matter of statutory construction that the Jones Act was an act "amendatory" to Title 53; therefore, by virtue of section 4 of the ORVA, the congressionally created action for damages at law in favor of a seaman injured by the negligence of his employer was unavailable to scientific personnel:

It is urged that, because the Jones Act is neither a part of Title 53 nor is expressly mentioned in the O.R.V. Law it should be considered to remain fully applicable to O.R.V.'s. But this conclusion does not necessarily follow.

The Jones Act was never a part of the Revised Statutes because it was adopted after they were compiled. Nor is it expressly referred to in the explanatory notes to the Oceanographic Research Law in U.S.C.A.

However, Title 53 of the Revised Statutes of 1878 bears the heading "Merchant Seamen" and was comprised of Sections 4501 through 4612. All of its extant provisions now appear in Title 46 of the United States Code (see Page 73 of the Tables volume of the United States Code Annotated). The Jones Act, which also deals with merchant seamen, is found in this same title (46 U.S.C.A. § 688). At least one part of the Jones Act, Section 31, amended a provision of Title 53 of the Revised Statutes, Section 4530.

It is plain both from its specific provisions and its overall purpose that the Jones Act amends or supplements Title 53 and would have been a part of that Title had it been enacted prior to 1878.

*Id.* at 6.

There is inherent tension in the *Sennett* opinion. The court clearly found that the

11. In *Castro v. M/V LAFAYETTE* the district court granted the motion of two defendants for summary judgment on a Jones Act claim and a general maritime claim of unseaworthiness, apparently relying upon section 4 of the ORVA as to both claims. The dismissal of the latter claim on that basis conflicts with *Sennett* and *Delahoussey,* which hold that the ORVA leaves unaffected the status of scientific personnel under general maritime law. The *Castro* court also found, however, that the moving defendants were not the owners of the vessel in question. While the court apparently did not rely on this finding in dismissing the unseaworthiness claim, it seemingly would have been dispositive of the matter. Refer to text at Section III *infra.*

ORVA did not in terms remove scientific personnel from seaman status under either general maritime law or the Jones Act. *Id.* The court also found from the legislative history of the Act that Congress had classified scientific personnel as non-seamen to avoid the application to them of "certain statutory regulations pertaining to seamen," and was not intended to provide relief from the general maritime obligations owed to such personnel. *Id.* at 4. Yet the court, after abbreviated consideration of the "specific provisions and overall purpose" of the Jones Act, concluded that it was an act "amendatory" to Title 53. The court also found support for this conclusion in Coast Guard regulations applicable to oceanographic vessels, *id.* at 6, although those regulations, like the Act itself, do not in terms remove scientific personnel from seaman status under general maritime law or the Jones Act.[12]

The events leading to the enactment of the Jones Act have been amply chronicled. *See, e.g.*, G. Gilmore & C. Black, *supra*, § 6–20. In 1903 the Supreme Court held that a seaman possessed no cause of action against his employer for negligence under the general maritime law. *The OSCEOLA*, 189 U.S. 158, 159, 175, 23 S.Ct. 483, 484, 487, 47 L.Ed. 760 (1903). In 1915 Congress passed an omnibus statute dealing principally with matters such as seamen's wages, working conditions on shipboard, desertion, and life-saving equipment.[13] Several sections in the 1915 Act amended provisions of Title 53. In section 20, a final and apparently unrelated provision, Congress expressed its dissatisfaction with the rule in *The OSCEOLA* by providing: "That in any suit to recover damages for any injury sustained on board vessel or in its service sea-

men having command shall not be held to be fellow-servants with those under their authority." Apparently, the congressional draftsmen interpreted the Supreme Court decision as holding that the fellow-servant rule precluded seamen from maintaining negligence actions against their employer under the general maritime law.

Shortly, in *Chelentis v. Luchenbach S.S. Co.*, 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171 (1918), the Supreme Court made clear that it was not the fellow-servant doctrine that dispossessed seamen under general maritime law of a negligence cause of action against their employer. Two years later Congress enacted the Merchant Marine Act of 1920.[14] The Act established the Shipping Board, enacted the Ship Mortgage Act, and made important amendments to the Maritime Lien Act of 1910. Sections 31 and 32 amended a provision of Title 53, and a second provision arguably supplemental to Title 53.[15] In section 33 of the 1920 Act, Congress again attempted to overrule *The OSCEOLA* by creating a statutory action for damages at law in favor of a seaman injured in the course of his employment. This provision has come to be known as the Jones Act.

The background of the Jones Act sheds some light on its status as an act amendatory of or supplementary to Title 53 of the Revised Statutes. Neither section 33 of the Act of 1920, nor section 20 of the 1915 Act expressly amend any provision of Title 53. Both acts, however, like the provisions of Title 53, are concerned with the protection of seamen, and in the subsequent compilation of the United States Code found a place alongside the earlier statutes in Title

12. *See* 46 C.F.R. § 188.05–33 (1981). Refer to note 9 and accompanying text *supra*.

13. Act of Mar. 4, 1915, ch. 153, 38 Stat. 1164.

14. Act of June 5, 1920, ch. 250, 41 Stat. 988. Actually, the Merchant Marine Act, codified at 46 U.S.C. § 861 *et seq.*, was only part of the Act of June 5, 1920, which, like the Act of March 4, 1915, was an omnibus statute.

15. Section 31 amended R.S. § 4530, a provision of Title 53, codified as amended at 46 U.S.C.

§ 597. Section 32 amended a provision of an 1884 act which appears to be supplemental to the regulatory scheme of Title 53. Act of June 26, 1884, ch. 121, § 10, 23 Stat. 55, codified as amended at 46 U.S.C. § 599. The *Sennett* court inadvertently referred to section 31 of the 1920 Act as one part of the Jones Act which amended Title 53. *See* Sennett, *supra*, at 6. The Jones Act, however, is a separate and discrete provision of the 1920 Act.

46, which relates to shipping, and particularly in chapter 18 of that title, which relates to "Merchant Seamen." *See Warner v. Goltra, supra*, 293 U.S. at 161, 55 S.Ct. at 49; *Sennett, supra*, at 6.

The contiguous placement of the Jones Act and the provisions of Title 53 in a chapter and title of the United States Code relating to merchant seamen apparently prompted the district court in *Sennett* to conclude that "the Jones Act amends or supplements Title 53 and would have been part of that title had it been enacted prior to 1878." *Sennett, supra*, at 6. This reasoning, however, is in direct conflict with the Supreme Court decision in *Warner v. Goltra, supra*. This Court finds *Warner* dispositive of the question of the Jones Act's status as an act amendatory or supplementary to Title 53, and therefore must decline to follow Judge Rubin's holding in *Sennett.*

In *Warner* the personal representative of a tugboat master brought suit under the Jones Act. The trial court sustained a demurrer to the complaint on the ground that "master" was not a "seaman" within the meaning of the Jones Act. The Supreme Court of Missouri affirmed the judgment below, resting its opinion on 46 U.S.C. § 713, which defines the term "seaman" for the purposes of Title 53.[16]

The United States Supreme Court, in an opinion by Mr. Justice Cardozo, reversed, rejecting the contention that the statutory definition of seaman under Title 53 of the Revised Statutes was applicable to the Jones Act. The Court reasoned:

> [W]ith a few verbal changes § 713 is a reenactment of § 65 of the Act of June 7, 1982 (17 Stat. 277), which was then known as § 4612 of the Revised Statutes. In the compilation of the Code some of the provisions for the protection of seamen contained in the Act of 1872 were placed in Title 46, which related to shipping, and particularly in Chapter 18 of that title, which related to "Merchant Seamen." They had previously been reenacted, as parts of the Revised Statutes,

along with § 65. The Acts of 1915 and 1920 were placed in the same chapter and title, and were thus brought into contiguity with the sections carried over from the Act of 1872. Very clearly the change of location did not work a change of meaning. The rule of construction laid down in § 713 must be confined to those sections of the chapter which were contained in the Act of 1872, or in the equivalent provisions of the Revised Statutes, before the Code had rearranged them. The compilers of the Code were not empowered by Congress to amend existing law, and doubtless had no thought of doing so. As to that the command of Congress is too clear to be misread.

293 U.S. at 160–61, 55 S.Ct. at 48–49 (footnotes omitted).

*Warner* establishes that persons excluded by statutory fiat from consideration as seamen under the provisions of Title 53 nonetheless may retain seaman status under the Jones Act. Further, the Supreme Court, in holding that the contiguous placement of the Jones Act and Title 53 in a chapter of the United States Code relating to merchant seamen does not make the statutory definition of seamen under Title 53 applicable to the Jones Act, considered and rejected the reasoning upon which the district court's conclusion in *Sennett* in large measure is founded. Accordingly, this Court holds that the Jones Act is not an act amendatory or supplementary to Title 53 of the Revised Statutes within the meaning of section 4 of the ORVA so as to prevent scientific personnel from asserting seaman status in actions against their employer arising under the Jones Act.

The defendant here argues, however, that reference to Title 53 in section 4 of the ORVA was merely Congress' way of incorporating into the Act the expansive statutory definition of "seaman" found in 46 U.S.C. § 713. *Cf. Castro v. M/V LAFAYETTE, supra*, slip op. at 3 (noting expansive concept of "seamen" in 46 U.S.C. § 713). Citing general references in the

16. Refer to note 7 *supra.*

legislative history of the Act to section 4 as a provision excluding scientific personnel from "the laws and regulations applicable to seamen," [17] the defendant urges that Congress indeed intended to bar scientific personnel from being considered as seamen under the Jones Act and general maritime law.

Conclusory statements in the legislative history of an act, however, must yield to its more specific provisions, just as imaginative interpretations of a statute must yield to its "plain meaning." Section 4 neither states nor implies that scientific personnel are not seamen for any purpose. It provides instead that they are not to be considered seamen under Title 53 of the Revised Statutes and acts amendatory or supplementary thereto. *See Sennett, supra*, at 6. While the definition of "seamen" in 46 U.S.C. § 713 is "directed to extension not to restriction," *Uravic v. F. Jarka Co.*, 282 U.S. 234, 239, 51 S.Ct. 111, 112, 75 L.Ed. 312 (1931), it extends only to "the sections fairly within its range," that is, to Title 53. *Warner v. Goltra, supra*, 293 U.S. at 161, 55 S.Ct. at 49.

Nor does the legislative history of the ORVA, on balance, support the defendant's contention that scientific personnel may not retain seamen status under the Jones Act and general maritime law. Congress adopted the ORVA in 1965 to exempt research vessels from the strict inspection and personnel protection laws mandated for commercial vessels. The legislative history, and particularly the hearings before the House Subcommittee, clearly show that Congress excluded scientific personnel from consideration as seamen under Title 53 to avoid the operation of regulations that were ill-suited to such personnel and unnecessarily hindered them in the performance of their technical or scientific functions. There is no indication, however, that Congress believed the Jones Act standard of care or the general maritime obligation to provide a seaworthy vessel to be so onerous when applied to scientific personnel as to require the exclusion of these persons from the range of the law's humanitarian policy.[18] This is amplified by the absence of congressional provision of a compensation scheme to scientific personnel, and the failure of the Act to state or imply that scientific personnel would have the protection of the statutes of each of the 50 states depending on the happenstance of where each made his contract of employment. *Sennett, supra*, at 4.

In sum, the Court finds that Congress in enacting the ORVA did not intend that scientific personnel, any more than traditional blue water sailors, should be left without a remedy if injured, or that their dependents were to be helpless if the injury resulted in death. *See Warner v. Goltra, supra*, 293 U.S. at 162, 55 S.Ct. at 49.[19] The

---

17. *See, e.g.,* H.R.Rep.No.599, *supra*; [1965] U.S.Code Cong. & Ad.News at 2387 (departmental report—U. S. Navy). It might be observed that this language, even when read out of the context of the Act's legislative history, is not particularly illuminating of congressional intent to exclude scientific personnel from seaman status under the Jones Act and general maritime. Viewed in the overall context of the legislative history, it tends to support the opposite conclusion. Refer to notes 2–10 & accompanying text *supra*.

18. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 95, 66 S.Ct. 872, 877, 90 L.Ed. 1099 (1945).

19. Mr. Justice Cardozo's eloquent conclusion in *Warner v. Golta* has some meaning for the instant case as well. In discussing the statutory distinction between masters and ordinary seamen under the provisions of Title 53 relating to the shipment of crews, wages, protection, release, discharge of seamen, and the like, the Court observed:

> [I]n respect of dealings of that order, the maritime law by inveterate tradition has made the ordinary seaman a member of a favored class. He is a "ward of the admiralty," often ignorant and helpless, and so in need of protection against himself as well as others. The master, on the other hand, is able in most instances to drive a bargain for himself, and then when the bargain is made, to stand upon his rights. Discrimination may thus be rational in respect of remedies for wages. *The Bethulia*, 200 Fed. 876; *The Putnick*, 291 Fed. 902. It is neither rational nor just if extended to remedies for bodily wounds. At such times master and seaman are approximately equal.

293 U.S. at 162, 55 S.Ct. at 49.

Here, too, with respect to remedies for personal injury or death, scientific personnel and

Court holds that scientific personnel on board oceanographic research vessels, if otherwise entitled to assert seaman status under the Jones Act and general maritime law,[20] are not prevented from doing so by the ORVA, but are entitled to the same remedies available to "all whose duties contribute to the operation and welfare of the vessel." *Offshore Co. v. Robison*, 266 F.2d 769, 775 (5th Cir. 1959).

### III. *Geophysical Service's Liability under General Maritime Law*

In the event the plaintiff is found to be a general maritime seaman, defendant contends that it owes no duty to plaintiff either by way of the warranty of seaworthiness or the doctrine of maintenance and cure, and is entitled to summary judgment on these counts.

■ Because the implied warranty of seaworthiness arises out of the vessel, maritime law imposes the absolute duty to provide a seaworthy vessel only upon those whose relationship with the vessel is that of owner or operator. *Daniels v. Florida Power & Light Co.*, 317 F.2d 41, 43 (5th Cir. 1963). Defendant urges that it did not stand in that relationship to the vessel in question, but was rather a time charterer. *See Loose v. Offshore Navigation, Inc.*, 670 F.2d 493, 498 (5th Cir. 1982). A purported copy of the time charter between Geophysical Service and Sealcraft Operators, the alleged demise charterer of the vessel, is attached as Exhibit A to the defendant's motion for summary judgment.

■ It is said that a bareboat or demise charter constitutes the only form of charter that purports to invest temporary powers of ownership in the charterer. *Baker v. Raymond International, Inc.*, 656 F.2d 173, 182 (5th Cir. 1981). To create a demise, the vessel owner must completely and exclusively relinquish "possession, command and navigation" of the vessel to the demisee. *Guzman v. Pichirilo*, 369 U.S. 698, 699, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962). Conversely, a time charterer is not the owner *pro hac vice* of the vessel, as the vessel owner does not relinquish operation or control of the vessel to the charterer. *See* G. Gilmore & C. Black, *supra*, § 4–14.

■■ Undoubtedly, and as a matter of law, one whose relationship to a vessel is defined solely by the provisions of a time charter is not the warrantor of the vessel's seaworthiness to seamen who work aboard her. Plaintiff apparently challenges the defendant's motion on this point only because the exhibited time charter lacks proper authentication. While there is probably no serious dispute as to the document's authenticity or the effect of its provisions, it is nonetheless not admissible as evidence absent proper authentication or identification. F.R.Evid. 901. Hence, defendant, as a party moving for summary judgment, has not met its evidentiary burden of showing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).[21]

---

traditional seamen are approximately equal. Nothing could be clearer from the testimony before the House Subcommittee than that members of the scientific party aboard research vessels are exposed to the perils of the sea as a condition of their employment, in exactly the same manner as crewmembers of ships of all types. Oceanographic Research Vessels Hearing, *supra*, at 28 (statement of Stanford T. Crapo, President, Marine Acoustical Services, Inc.).

**20.** The question of seaman status under the Jones Act and general maritime law ordinarily is one of fact, *see Offshore Co. v. Robison*, 266 F.2d 769, 779 (5th Cir. 1959), and the Court expresses no opinion as to the plaintiff's status under those laws.

**21.** Beyond this, the courts in this circuit look through the form of a transaction to its substance to determine whether an agreement for the use of a vessel constitutes a particular form of charter or some other relationship. *Agrico Chemical Co. v. M/V BEN W. MARTIN*, 664 F.2d 85, 91–92 (5th Cir. 1981). *See Loose v. Offshore Navigation, Inc.*, *supra*, at 498 n.8. There is no suggestion here, however, that the substance of the purported transaction is at variance with its form, or that the defendant exercised any form of operation or control over the vessel ordinarily incident to ownership or demise.

Defendant also maintains, while conceding that it was plaintiff's employer, that it is under no obligation to provide maintenance and cure because it was not the owner of the CARRIBEAN SEAL.[22] Because the question of the defendant's status as an owner *pro hac vice* of the vessel remains unresolved, the motion for summary judgment lacks foundation. The Court does not intimate, however, that the defendant, as plaintiff's employer but not the owner of the vessel on which he served, is not bound under general maritime law to provide maintenance and cure. The law in this and other circuits is plainly to the contrary. *See, e.g., Baker v. Raymond International, supra,* at 185; *Caulfield v. AC & D Marine, Inc.,* 633 F.2d 1129, 1131 (5th Cir. 1981), *Mahramas v. American Export Isbrandtsen Lines, Inc.,* 475 F.2d 165, 170–71 (2d Cir. 1973). *See also* G. Gilmore & C. Black, *supra,* § 6–7, at 285–86.[23]

Accordingly, it is ORDERED, ADJUDGED and DECREED that the defendant's motion for summary judgment be and the same is hereby DENIED.

---

**22.** Relying principally on Judge Brown's statement in *Isthmian Lines, Inc. v. Haire,* 334 F.2d 521, 523 (5th Cir. 1964), that the right to maintenance and cure arises out of relationship between ship and seaman, and not from the seaman's contract of employment, defendant argues that a seaman's employer who is not a shipowner should not be obligated to provide maintenance and cure. While this conclusion may be a logical extension of Judge Brown's reasoning, it has not been adopted by the Fifth Circuit to date. Refer to note 23 and accompanying text *infra.*

**23.** In *Baker* Judge Rubin held that an *in personam* action for maintenance and cure may be brought only against the seaman's employer, but that an *in rem* action would lie against the

vessel. In *Caulfield,* the Court, without discussing the *in rem* or *in personam* aspects of the action, indicated that maintenance and cure may be recovered from either the employer or shipowner. Presumably, an *in personam* action would lie against the shipowner only when he is the seaman's employer, although the availability of the *in rem* action makes this requirement, as a practical matter, meaningless. Whether the right of maintenance and cure arises from the relationship between ship and seaman, as Judge Brown apparently believes, or from the seaman's contract of employment, as Judge Rubin has opined, for present purposes is purely academic. The law in this circuit, at least for now, is quite clear.